**MONTANA–DAKOTA UTILITIES COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 79–1915.

United States Court of Appeals, Eighth Circuit.

Submitted June 9, 1980.

Decided Aug. 21, 1980.

**558**

Robert J. Haggerty, McGee & Ketcham, Washington, D. C., argued, for petitioner; James S. D. Eisenhower and Ted P. Gerarden, Washington, D. C., on brief.

George H. Williams, Jr., Federal Energy Regulatory Commission, Washington, D. C., argued, for respondent; Robert R. Nordhaus, Gen. Counsel, Jerome Nelson, Sol., Washington, D. C., on brief.

Before HEANEY and ARNOLD, Circuit Judges, and OVERTON,* District Judge.

HEANEY, Circuit Judge.

The Montana-Dakota Utilities Company (MDU) petitions for review of a decision of the Federal Energy Regulatory Commission denying MDU's request for a rate increase. The effect of that decision is to exempt MDU's three jurisdictional customers from paying their small share of increased purchased gas costs even though they benefit from the purchased gas. We hold that the decision is contrary to law, is not supported by substantial evidence on the record as a whole and is unjust and unreasonable.

I

MDU began its corporate existence in the 1930's as a collection of small separate gas systems in Minnesota, Montana, North Dakota, South Dakota and Wyoming. Over the years, MDU has directly connected all but two of these systems by means of its certificated interstate pipeline. The system serving Sheridan, Wyoming, and the towns around it is one of these two.[1] Traditionally, MDU purchased gas for use in the Sheridan system from Northern Utilities, Inc., who, in turn, purchased gas from the Atlantic Richfield Company (ARCO). In 1974, however, Northern Utilities notified MDU that it would terminate the existing gas sales contract upon its expiration on March 31, 1975. This action was taken because MDU had acquired, for use in its interstate system, the rights to the ARCO gas.

Because MDU could not supply the Sheridan system directly from its interstate pipeline, MDU arranged a gas exchange agreement with Northern Utilities and its affiliate, Northern Gas Company. Under this arrangement MDU agreed to sell gas from its interstate system to Northern Gas Company. In return, Northern Utilities agreed to continue to supply the Sheridan system with an equivalent amount of gas from its intrastate system. The exchange agreement took effect on April 16, 1975, pursuant to a temporary certificate of public convenience and necessity issued by the Federal Power Commission, the predecessor agency of the Federal Energy Regulatory Commission (FERC or Commission). In 1975 and 1976, nearly all of Sheridan's needs were met by the interstate system pursuant to the exchange agreement. In July of 1976, MDU secured, from the so-called "Powell II Unit" in Wyoming, another intrastate source of gas. Through an intrastate exchange agreement with Northern Utilities,

---

* The Honorable WILLIAM R. OVERTON, United States District Judge for the Eastern District of Arkansas.

1. MDU also owns and operates a separate gas distribution system in Crookston, Minnesota.

intrastate gas was then made available to the Sheridan system. On February 25, 1977, the Commission issued a permanent certificate for the interstate exchange agreement between MDU and Northern Gas Company. This certificate (No. CP75–227), however, authorized the exchange only to the extent necessary to make up deficiencies in the intrastate supplies available for use in the Sheridan system. Because the Powell II source has been more than sufficient to meet the Sheridan system's needs since 1976, except for minor interruptions, no further substantial MDU-Northern Gas Company exchanges have been necessary. Current projections indicate, however, that significant exchanges will be required in future years.

The current problem arose because the price of the Powell II gas, which is not subject to federal regulation, increased at a substantially greater rate than the price of interstate gas.[2] In 1978, if this price increase had been absorbed by customers on the Sheridan system alone, their rates would have increased by seventy-nine cents per thousand cubic feet (Mcf). By contrast, if the increase had been spread to all of MDU's customers, the rate increase would have been only ten cents per Mcf. As a consequence, MDU proposed to spread the cost of the high-priced intrastate gas among all its customers.[3] In order to accomplish this, MDU tendered for filing with the Commission a proposed Purchased Gas Adjustment (PGA) increase in the rates to be charged MDU's customers within the Commission's jurisdiction. After suspending them for one day, the Commission permitted MDU's proposed rate increases to go into effect, subject to refund should they be found to be unlawful.[4] MDU's subsequent PGA filings have been treated similarly by the Commission.

Following an investigation and hearing, an administrative law judge issued an initial decision determining that MDU should not be permitted to spread among its interstate jurisdictional customers the cost of the intrastate gas used in Sheridan, and ordered refunds of the increased amounts already collected by MDU. The judge gave two reasons for holding that MDU was not entitled to a PGA increase based on the price of gas used in Sheridan: (1) MDU's interstate customers receive insufficient benefit from the high-priced Powell II gas to justify allocating the cost of that gas among all customers; and (2) MDU's tariff permits only costs incurred by MDU's "integrated system" to be charged to its interstate customers, and the Sheridan system is not part of that "integrated system."

The Commission affirmed the initial decision for the two reasons stated by the administrative law judge. MDU challenges both of these grounds. In addition, MDU argues that the Commission was without power to order refunds in this case.[5]

---

**2.** The primary cause of the increase was the triggering of the "favored nation's clause" in MDU's Powell II supply contract. This clause, which allowed the Powell II producer to raise the price of gas up to the maximum rate set by the Federal Power Commission (the FERC's precursor), was triggered when the Federal Power Commission increased the national rate for wells drilled in 1975 and 1976 from a base rate of 52 cents per thousand cubic feet (Mcf) to $1.42 per Mcf.

**3.** As detailed later in this opinion, MDU first proposed to spread the increased cost among its Wyoming customers only, resulting in a rate increase of 37 cents per Mcf. But the Wyoming Public Service Commission denied that request, ordering that the costs be spread throughout MDU's integrated system.

**4.** Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, requires natural gas companies to file with the FERC the rates for their sales of natural gas for resale in interstate commerce. A proposed rate change filed by a gas company takes effect in 30 days. If the Commission acts within the 30-day period, however, it may suspend the rate change and order hearings to determine if the proposed rates are just and reasonable. Although the gas company may begin collecting the proposed rates at the end of the suspension period, the Commission may, after full hearing, order the company to refund the portion of the increased rates found to be unjustified. 15 U.S.C. § 717c(e).

**5.** Because we hold that the Commission erred in refusing to allow MDU to allocate the cost of the Powell II gas systemwide, we need not consider the question of refunds.

## II

■ Before we detail MDU's specific challenges to the Commission decision, it is necessary to consider the scope of review that governs our decisions in cases of this type. The Commission argues that its determination of a just and reasonable cost allocation, and its interpretation of the terms of natural gas tariffs, are ordinarily "entitled to a considerable amount of deference." *Public Serv. Co. v. FERC,* 600 F.2d 944, 954 (D.C.Cir.), *cert. denied,* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979). We do not disagree. Even the opinions cited by the Commission, however, recognize that deference to the Commission's expertise does not preclude all review. The Commission decision still must be supported by substantial evidence. *See id.; State Corp. Comm'n v. Federal Power Comm'n,* 206 F.2d 690, 698 (8th Cir. 1953), *cert. denied,* 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954). We turn now to consider whether the evidence of record supports the Commission findings.

### 1. *Benefit to jurisdictional customers.*

The administrative law judge found that allocating the costs of the Powell II gas systemwide would not be just and reasonable and would subject the jurisdictional customers to undue prejudice or disadvantage. The basis of the judge's finding was that the jurisdictional customers received insufficient benefit from the Powell II gas to justify imposing its high price on all customers. In support of this position, the judge noted that MDU's interstate system was not burdened with the Sheridan system load prior to issuance of the CP75–227 certificate authorizing the gas exchange. Nor has the interstate system been burdened by the Sheridan load since Powell II gas became available. "Returning MDU's interstate system to the *status quo ante,*" the judge reasoned, "is not a sufficient benefit to jurisdictional customers to burden them with costs of Sheridan's intrastate gas sup-

ply." In affirming the judge's decision, the Commission went a step further, finding that the jurisdictional customers received *no* benefit from the Powell II supply.

■ In our view, this conclusion is supported by neither the record nor by reason. The Powell II gas meets a need that would otherwise be filled by interstate gas. The Commission decision simply ignores the fact that the Sheridan system primarily serves high-priority residential customers who cannot be, quite literally, left out in the cold. The history of the events surrounding the exchange agreement supports this conclusion. As noted earlier, on February 10, 1975, MDU requested that it be allowed to exchange gas with Northern Gas Company in order to ensure a supply for Sheridan. The Commission issued a temporary certificate authorizing the exchange on April 10, 1975, and deliveries of interstate gas began on April 16, 1975. On April 26, 1976, after a hearing, the administrative law judge rendered his opinion on the exchange agreement. He concluded that, inasmuch as no other source of gas was available, use of interstate gas through the exchange must be permitted to continue.

The Commission staff filed exceptions to the judge's decision on the grounds that the exchange constituted a diversion of interstate gas for purely intrastate use and that no need had been shown for that diversion. Prior to the Commission's decision, MDU informed the Commission that much, if not all, of the Sheridan system's needs would be met by a new intrastate source, Powell II. Rather than reopen the record to accept evidence of the availability and effect of the Powell II source, the Commission simply made its order authorizing the exchange conditional: Interstate gas was not to be used unless intrastate supplies were insufficient to meet Sheridan's needs.[6]

The language of both the administrative law judge and the Commission in the decisions on the CP75–227 certificate makes it clear that it is in the interest of the public

---

6. The CP75–227 certificate provided, in part:

(1) The service authorized herein will be utilized only to the extent necessary to offset

supply deficiencies up to a maximum of 6,000 Mcf of gas per day available to MDU from all intrastate sources in the State of Wyoming.

to ensure that Sheridan's high-priority residential customers receive a supply of gas, even if it is at the expense of the interstate system's low-priority industrial users. The administrative law judge recognized the reality of the situation when he noted:

> Every sale by an interstate pipeline to any distributor represents the diversion of interstate gas to an intrastate use. The question is not one of interstate versus intrastate; for MDU's customers on the Sheridan System are in the same position as the customers on the rest of its distribution systems. All of these distribution customers are intrastate consumers receiving gas from an interstate pipeline. The residential and commercial customers in Sheridan are no more "intrastate" than the customers anywhere else on MDU's system.

The Commission also recognized that when a group of customers has been served for a long period of years from an intrastate pipeline, and it develops that there is no alternative means of providing gas for that group, the interstate system must fill the need. The Commission stated,

> Since almost all of the service to Sheridan is for high priority users the Judge correctly found that the public convenience and necessity *required* that the service be continued. Given the circumstances we believe the Judge had *no other choice* but to approve the application as proposed. [Emphasis added, footnote omitted.]

Thus, even prior to the issuance of the CP75–227 certificate, the interstate system was under a responsibility, albeit unexpressed, to supply the Sheridan system with gas in the event of an intrastate supply shortage. Were it not for Powell II or some other intrastate source, MDU would be required to curtail service to some of its low-priority jurisdictional customers to ensure the supply of Sheridan's high-priority customers. That is what happened in 1975 and 1976, and what will likely happen in the future. Because the Powell II supply relieves the interstate system of this burden, thereby increasing the amount of gas available to MDU's interstate jurisdictional customers, the interstate system receives a clear benefit from the Powell II gas.[7] Accordingly, we conclude that there is no basis in the record for the Commission's finding that the interstate system does not benefit from the Powell II gas.

The Commission's determination that MDU's proposed cost allocation would not be just or reasonable is unsupportable for another reason: fundamental fairness requires that the cost of the Powell II gas be allocated to all customers on MDU's integrated system. Again, a review of the background of the case supports this conclusion. After the exchange agreement went into effect, the cost of the Powell II gas increased much faster than did the cost of the interstate gas. Rather than have the Sheridan system customers bear this increase alone, MDU filed a proposed rate increase with the Wyoming Public Service Commission to spread the increased cost to all Wyoming customers. In an order of June 24, 1977, the state Commission rejected MDU's proposal, authorizing instead the allocation of gas costs throughout MDU's integrated system:

> MDU shows that it is attempting to obtain additional potentially substantial but very high-priced gas from various areas in Wyoming. Following MDU's proposed pricing concept in this case all new high-priced Wyoming gas bought by it at any

7. We note that in two earlier Commission cases, *Columbia Gas Transmission Corp.*, Docket Nos. RP73–65 (PGA 75–5), Order Granting Intervention and Denying Motion for Enforcement of Commission Order (August 1, 1977), and *Tennessee Natural Gas Lines, Inc.*, Docket Nos. RP76–99, Opinion No. 8 (February 21, 1978), the Commission authorized allocating the cost of certain gas to customers who were not actually served by that gas. The Commission distinguished the *Columbia* and *Tennessee* cases from this case, however, by emphasizing that in those cases the gas in question physically entered the interstate pipelines, thus increasing the systems' operating flexibility and reducing the need for emergency gas during severe weather. Because it is clear that MDU's interstate system benefits from the Powell II gas through displacement, however, we find the Commission's distinguishing grounds unpersuasive.

future time could be attributed to the Wyoming system service and the cost benefits of existing far lower cost Wyoming supplies would be shifted to out-of-state use. This is patently unfair, especially because MDU's need for replacement gas is generated by its greatest growth areas which are out-of-state. Additionally, MDU itself has followed an integrated concept in the pricing of gas: (1) in this case for determining Wyoming gas cost (aside from Powell II gas), and (2) in the recent "pass-on" to Wyoming customers authorized by us of FPC purchased gas cost increases. By applying a Wyoming only basis (excluding Powell II gas) for the recent authorized pass-on the cost to Wyoming users would have been notably less cost. The public interest clearly requires the interexchange of gas supply, whether directly by displacement, or by exchange not only between the [Sheridan] and [other Wyoming] service areas, but also into MDU's total integrated system if any part thereof is to retain a balanced continuity of gas supply.

After the Wyoming Commission ordered system-wide allocation, MDU went to the public service commissions of the other states involved, Montana, North Dakota and South Dakota. All three of these commissions recognized the fairness of a broad-based allocation and authorized the spread of Powell II gas costs to the integrated system customers within their respective jurisdictions. Significantly, the integrated system customers within state jurisdiction account for ninety-seven percent of MDU's total sales. The Commission decision in this case, therefore, allows the remaining three percent—the federal jurisdictional customers—to escape paying the costs that all other customers on the system are paying.

■ Moreover, because MDU cannot now go back to collect from its Sheridan system customers the unrecovered portion of the previously incurred Powell II costs, the Commission decision would prevent MDU from being reimbursed for those legitimate business expenses—even though the administrative law judge specifically found that

the Powell II gas price did not exceed the maximum national rate set by the Commission. As the Supreme Court has observed, we must look to the result of the Commission decisions, not just the technical rationale. See *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 591, 65 S.Ct. 829, 834, 89 L.Ed. 1206 (1945). In no way can the Commission result in this case be considered just and reasonable.

*2. The inclusion of Sheridan in MDU's "integrated system."*

■ It is undisputed that the rates MDU can collect from its customers are governed by the gas tariff MDU has filed with the Commission. See *Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251–252, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951); *Public Serv. Co. v. FERC, supra*, 600 F.2d at 957; *City of Cleveland v. Federal Power Comm'n*, 525 F.2d 845, 854–855 (D.C.Cir. 1976). It is the *interpretation* of MDU's tariff, however, that is disputed in this case. The administrative law judge held that the tariff did not permit the increase sought by MDU because the PGA clause in the tariff allowed adjustments only to reflect "changes in [MDU's] *integrated system* average cost of purchased gas" (emphasis by the administrative law judge), and because the Sheridan system was not part of the integrated system.

In determining that the Sheridan system was not part of the integrated system, the judge emphasized that the map filed with MDU's tariff, entitled "Montana-Dakota Utilities Co., Integrated Natural Gas System," did not show either the Sheridan, Wyoming, or the Crookston, Minnesota, systems. By contrast, the judge noted, a map of MDU's entire facility, entitled "Montana-Dakota Utilities Co., Natural Gas System," included Sheridan and Crookston. In addition, the judge relied on statements of MDU's witnesses that appeared to distinguish MDU's integrated system from the Sheridan and Crookston systems.

■ After a careful review of the record, we are convinced that neither these facts nor any others in the record constitute sub-

stantial evidence in support of the Commission's view. First, the witness statements cited by the administrative law judge do not support the conclusion that the Sheridan system is separate from the integrated system. On one of the two pages in the transcript cited by the judge, the only reference to MDU's "integrated system" is the statement that the Crookston, Minnesota, system is served by Canadian gas and is entirely separate from the integrated system. It is difficult to see how this statement suggests that Sheridan is not part of the integrated system. Indeed, the fact that Crookston is mentioned but Sheridan is not tends to indicate that Sheridan, unlike Crookston, is part of the integrated system. The other transcript page cited by the judge states that Sheridan's gas supply will come from the "integrated system" in the event that intrastate sources are insufficient to fill the need. This merely states a known fact, recognized by the Commission when it issued the CP75–227 certificate. Again, it may even indicate that, for practical purposes, the integrated system and the Sheridan system should be treated as one.

More importantly, all other evidence indicates that the Sheridan system is, in fact, a part of MDU's integrated system. MDU's interstate pipeline is physically linked to its Sheridan system by the pipelines of non-affiliated companies and gas is readily exchanged between these pipelines, either directly or through displacement. As noted earlier, the reality of the situation is that MDU's Sheridan system customers, no less than the rest of its customers, have access to a portion of MDU's overall gas supply. The administrative law judge that considered the need for the CP75–227 certificate found this access to be required by the public interest, and the Commission agreed. It cannot now be permitted to determine, on the most technical of grounds, that the Sheridan system has no real connection with the integrated system.

Finally, the history of MDU's system compels the conclusion that Sheridan is rightfully part of the integrated system. As it has become necessary and feasible, MDU has incorporated its formerly separate systems into its integrated system. In 1975 and 1976, substantially all of the Sheridan system's needs were supplied, through exchange, by integrated system gas, and projections show that further infusions of integrated system gas will be needed before the end of the decade. Given the current realities of dwindling gas supplies, it is clear that the Sheridan system is now, in the larger scheme of things, a part of MDU's integrated system.

We reverse the decision of the Federal Energy Regulatory Commission and remand with directions to take further action consistent with this opinion.