WISCONSIN ASSOCIATION OF MANUFACTURERS & COMMERCE, INC., Appellant-Petitioner,

CITY OF EAU CLAIRE, Co-Appellant-Petitioner,

v.

PUBLIC SERVICE COMMISSION of Wisconsin, Respondent,

CITY OF LA CROSSE and Northern States Power Company of Wisconsin, Intervenor-Respondents.†

Supreme Court

*No. 78–632. Argued January 5, 1981.—Decided February 2, 1981.*

(Also reported in 301 N.W.2d 247.)

For the petitioner there were briefs by *Arvid A. Sather, Ellen E. Sward,* and *Michael, Best & Friedrich* of Madison, and oral argument by *Arvid A. Sather.*

For the co-appellant there was a brief by *Floyd E. Wheeler, Niles Berman* and *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.,* of Madison, and oral argument by *Niles Berman.*

---

† Motion for reconsideration denied, with costs, on March 16, 1981. ABRAHAMSON, J., took no part.

For the respondent the cause was argued by *Barbara E. James,* assistant chief counsel, with whom on the brief were *Steven M. Schur,* chief counsel, Public Service Commission, and *Bronson C. La Follette,* attorney general.

For the city of La Crosse there was a brief by *George R. Kamperschroer, Michael G. Stuart, Richard L. Olson* and *Boardman, Suhr, Curry & Field* of Madison, and oral argument by *George R. Kamperschroer.*

For Northern States Power Company there was oral argument by *David Baker* of *Foley & Lardner* of Milwaukee.

STEINMETZ, J.  This case comes before the court on a petition to review a decision of the court of appeals, which had affirmed the trial court. At issue is whether the Public Service Commission exceeded its lawful authority in setting rates for the sale of natural gas by the Northern States Power Company.

Northern States Power Company (NSP) provides natural gas to consumers in two principal areas in Wisconsin. The southern division serves the La Crosse-Hudson area and the central division serves the Eau Claire area. In July 16, 1976, NSP filed an application with the Public Service Commission (PSC) for an increase in rates for both areas. The PSC held hearings and, on January 10, 1978, issued a finding of facts and order establishing a new rate design. This rate design departed significantly from the previous rate design authorized by the PSC and the one requested by NSP.

Under the old rate design, consumers were organized into various classes and each class was assessed a rate designed to cover the cost of service to that class. The four classes were: (1) residential, (2) commercial and industrial, (3) large general service, and (4) interruptible. The first three classes are known as "firm" custo-

mers. These customers usually have no alternate fuel source and are guaranteed natural gas supplies sufficient to satisfy their full needs. The fourth class, the interruptible customers are given the lowest priority. They either have alternate fuel sources or shut down their operations when gas is not available.

It is the purpose of natural gas utilities to order as much gas from the pipeline suppliers as will be necessary to satisfy the total peak demand of their firm customers. In accordance with this desire, NSP pays a "demand charge" to the pipeline company which entitles it to draw from the pipeline as much gas as it wants, up to the estimated peak total demand of its firm customers. The amount of the demand charge depends, of course, on the size of the estimated peak total demand. When the gas is drawn from the pipeline, a "commodity charge" also becomes due, the amount depending on the volume of gas actually withdrawn. Due to unpredictable factors, chiefly weather, it is impossible to make a perfectly accurate estimation of total peak use. If the weather is less severe than expected, NSP finds that it has demanded more gas from its suppliers than its firm customers can use. The demand charge, however, must be paid in full regardless of the actual use by firm customers. If less is used by the firm customers than the projected demand contemplated, then it is the practice of NSP to sell the excess gas to its interruptible customers. If, due to cold weather, there is no excess gas, the interruptible customers are cut off completely.

The interruptible customers serve an important function in the gas distribution system. By purchasing gas on which the demand charge has already been paid (or contracted for), the interruptible customers assume part of the burden of paying the demand charge which would otherwise fall entirely on the firm customers.

Before the January, 1978, revisions, the rates for natural gas sales were based on the cost of service to

each class. Under the challenged PSC rates, however, a dramatic shift was made away from the cost-of-service basis. The commission said in its order that the new price structure was designed to "provide additional incentives to customers to perform further conservation measures." NSP, in line with traditional practices, had requested an increase of about 4% in all customer categories. Under the PSC's new conservation oriented rate schedule, however, the price for natural gas supplied in the southern division to the first category of customers was increased by only 2% over the old rates. In the second category, an increase of 3.25% and in the third category, an increase of 14.7% was authorized. In the interruptible class, an increase of 22.2% was ordered. The Wisconsin Association of Manufacturers and Commerce, Inc. (WAMC), representing the interruptible customers, challenged this rate increase. Both the trial court and the court of appeals affirmed the commission's actions.[1]

The association claims the PSC's actions are invalid on three grounds:

(1) The PSC did not adequately explain its reasons for departing from its former rate-setting system;

(2) The record does not support the pricing of natural gas to interruptible customers substantially above the cost of service; and

(3) The commission's order is unreasonable and unjustly discriminates against interruptible customers.

Due to a single order of the PSC in regard to the NSP request for the rate increase, another issue is also present. The City of Eau Claire challenges the PSC decision to maintain separate tariffs for NSP's two service areas. The central division (Eau Claire) receives its natural gas from Canadian sources; the southern division from domestic sources. Canadian natural gas is significantly

---

[1] *Wis. Asso. of Manufacturers & Commerce v. PSC*, 94 Wis.2d 314, 287 N.W.2d 844 (Ct. App. 1979).

more expensive than federally regulated domestic natural gas. Eau Claire claims that the PSC is required, in its regulatory capacity as a substitute for competition to spread the costs of NSP's higher priced gas throughout the entire system.

Neither appeal challenges the total authorized rate of return granted to NSP on January 10, 1978. Further, the parties have stipulated that no relief is sought for any sums collected by NSP under the rates in issue.

NSP filed an application with respondent for authority to increase natural gas utility rates on October 5, 1979. Subsequent to completion of procedures established by respondent under the laws of the State of Wisconsin, respondent entered an order establishing a new rate of return and rate design for NSP, dated November 6, 1980. No appeals have been taken from this order and the time for appeal has now expired.

The Public Service Commission has moved for dismissal of this appeal of the Wisconsin Association of Manufacturers and Commerce, Inc., and confirmation of the order under review.

The WAMC concedes the mootness of the issue due to the subsequent rates of November 6, 1980. It asks this court, however, to rule on the issues due to the length of the review process, the PSC can avoid challenge of rates by subsequently changing them before this court has ruled. This is not reality since it was petitioners who stipulated not to challenge the rates granted NSP and to not seek return of tariffs paid under this order.

The petitioners, therefore seek a truly advisory opinion of the court. The general rule is that a court will not determine abstract principles of law, since they become abstract when a determination is sought which, when made, cannot have any practical effect upon an existing controversy. *Racine v. J-T Enterprises of America, Inc.,* 64 Wis.2d 691, 221 N.W.2d 869 (1974). Since review

is sought of an order which has been superseded and is no longer of any force or effect and reversal and remand cannot have any practical effect, the appeal is dismissed as moot.

"This court has previously announced that it will not ordinarily consider questions which have become moot due to a change in circumstances. *State ex rel. Renner v. H&SS Dept.*, 71 Wis.2d 112, 116, 237 N.W.2d 699 (1976). However, there are exceptions to this rule. This court will consider questions which are otherwise moot in situations, for example, where the question is one of great public importance, *Ibid.* at 116, or of public interest, *Muller v. Jensen,* 63 Wis.2d 362, 217 N.W.2d 277 (1974); where the problem is likely to recur and is of sufficient importance to warrant a holding which will guide trial courts in similar circumstances, *Oshkosh Student Asso. v. Board of Regents,* 90 Wis.2d 79, 279 N.W.2d 740 (1979). . . ." *State v. Cramer,* 98 Wis.2d 416, 420, 296 N.W.2d 921 (1980).

The case presently before the court presents questions which are of great public importance and which are likely to recur. This court will therefore consider these questions so as to establish a guide for future actions by the PSC and by the lower courts.

No party in this case takes the position that conservation is an improper or unreasonable consideration of the PSC in setting rates and enforcing that policy through rates.

Sec. 227.20(8), Stats., states an unusual review standard for the court in that the agency action be within the agency's discretion, and if a deviation or inconsistency compared to the agency's prior policy or practice, such action must be "explained to the satisfaction of the court by the agency."[2]

---

[2] Sec. 227.20(8), Stats., provides:

"(8) The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent

Sec. 227.20 (6), Stats., sets another requirement of review by the court of agency action as follows: "The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."[3]

The PSC is required by sec. 196.37 (1), Stats., to assure "reasonable rates."[4]

The law requires the PSC to issue its decisions in writing accompanied by findings of fact and conclusions of law.[5]

---

with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion."

[3] Sec. 227.20 (6), Stats., provides:

"If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."

[4] Sec. 196.37 (1), Stats., provides:

"**Lawful rates; reasonable service.** (1) Whenever upon an investigation made under the provisions of chapters 196 and 197 the commission shall find rates, tolls, charges, schedules or joint rates to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, the commission shall determine and by order fix reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed in the future in lieu of those found to be unreasonable or unlawful."

[5] Sec. 227.10, Stats., provides:

"**Decisions.** Every proposed or final decision of an agency or hearing examiner following a hearing and every final decision of an an agency shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence."

The PSC may state the findings of fact as "a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence." Sec. 227.10, Stats.

The January 10, 1978, order issued by the PSC listed 22 findings of ultimate fact without the mention of conservation. Conservation effects were not referred to in the agency's findings, conclusions of law or order. The only reference to conservation of gas supplies in the order is at pages 23–25 of the order. At those places, the following was stated under a heading entitled "Gas Rates":

"Crucial factors to be considered in the natural gas industry today include the following:

"1. Dwindling total available supply, both annual and peak-day, from major pipeline suppliers pursuant to Federal Energy Regulatory Commission orders;

"2. Resulting decline in the sale of gas for interruptible use and transfer of such gas to annual use by new firm customers; and,

"3. Decline in gas availability for firm customers.

"These factors require a different emphasis on certain rate design criteria than used in past periods of ample or excess gas supply.

"This commission has stated its policy on gas conservation in several previous rate increase proceedings '. . . that conservation must be the theme of any reasonable gas policy—federal or state.' This policy was reaffirmed in the commission's September 22, 1977 order in docket no. 05–GV–2 which required the state's ten class A utilities to implement comprehensive conservation programs. To mitigate the impact of rising gas bills and to reduce the impact of curtailment on the lower priority industrial users, the commission and applicant must proceed with the utmost urgency to promote further conservation of natural gas. The rates adopted herein will provide additional incentives to customers to perform further conservation measures.

". . .

"It is expected that the rate structure changes and rate level increases as authorized herein (Appendix C) will

provide the necessary incentives for all customers to perform further conservation measures. Customers have the ability, if they conserve, to reduce the impacts of increasing costs of gas service and the effects of supply reductions."

This last statement of conservation is consistent, if not as direct, with the PSC's argument in its brief as follows:

"As the price of interruptible gas begins to approach that of alternative fuels, it is anticipated that interruptible customers will begin to switch over to the alternatives, thus ceasing to use high quality, scarce gas for low priority uses such as boiler fuel."

The PSC argues that weaning of low priority users who have alternative fuels available to them of high quality natural gas is a form of conservation.

In the statement of the PSC Docket No. 1–AC–14 Volume 1 entitled "Natural Gas in Wisconsin Generic Environment Impact Statement" issued April, 1980, at page 180 conservation is defined as follows:

"Thus, the meaning of the term 'conservation' as used in the gas industry differs somewhat from the common understanding.

"Thus, conservation in the gas industry can be described as the efficient use of a resource rather than as the saving of a resource. The 'efficiency' definition is appropriate when one considers the complexity of the gas industry."

In the same report, at page 182, the commission states that businesses and industries are likely to respond to a greater degree to price rises than residential customers due to the former group's large expenditure for natural gas.

Proper use by interruptibles of gas meets the "efficient use" definition of conservation. Weaning them from the use of gas by high rates may fit the saving of a resource (gas) definition of conservation.

The court of appeals supplied its own definition as follows:

"Conservation may be generally defined as the supervision of something by a governmental authority: such as the planned management of a natural resource to prevent exploitation, destruction, or neglect, or the wise utilization of a natural product to insure its future use."

That is a dictionary definition of conservation. The agency must by law state ultimate facts in its orders as to how its rates are predicted to accomplish conservation.

This order stated intent and, hope, but not ultimate facts of result.

Sec. 227.20(10), Stats., sets the court review consideration that "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it."[6]

The court is not required to accept conclusions of an agency when it has not complied with its duty in the exercise of its discretion to write a concise and separate statement of ultimate conclusions upon each material issue of fact. Sec. 227.10, Stats.

This challenged order did not comply with the duty of the PSC and is subject to this court's ruling in *Transport Oil, Inc. v. Cummings,* 54 Wis.2d 256, 195 N.W.2d 649 (1972), wherein we quoted favorably the following passage from *Burlington Truck Lines v. United States,* 371 U.S. 156, 167 (1962):

---

[6] Sec. 227.20(10), Stats., provides:

"(10) Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. The right of the appellant to challenge the constitutionality of any act or of its application to the appellant shall not be foreclosed or impaired by the fact that the appellant has applied for or holds a license, permit or privilege under such act."

" 'There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice. See *Siegel Co. v. Federal Trade Comm'n,* 327 U.S. 608, 613–614. Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion." ' "

The PSC did state ultimate conclusions upon material issues of fact in the challenge of petitioner, City of Eau Claire, to the order. They were located in the body of the order entitled "Revenue Requirements." The agency stated in ordering a disparity in gas rates between the Eau Claire and La Crosse area customers the following:

"The simple truth is the cost of purchased gas above is enough to create the wide disparity in rates between the two systems and the cost of purchased gas is directly assigned to each system not arbitrarily allocated.

"The claim that a disparity in rates creates an unfair and discriminatory situation is not supported by fact.

"The critical issue at hand is whether applicant's two gas utility systems are physically integrated to such a degree that gas is co-mingled from system to system. Testimony in the record disclosed the following: there is no physical connection between the two pipelines in Wisconsin; . . .

"Accordingly, based on the above facts, the commission finds the gas utility of applicant to be two separate operating systems, and not physically integrated. The proper measure of the cost of gas utility service must be made separately for each system."

The above are ultimate conclusions of fact, as required by statute, that a court can look to a record for "substantial evidence" to sustain.[7]

---

[7] Sec. 227.20 (6), Stats.

The statement in the order "The rates adopted herein will provide additional incentives to customers to perform further conservation measures" does not inform a court of how the record led to that conclusion.

*By the Court.*—The review of the decision of the court of appeals is dismissed as moot.

ABRAHAMSON, J., took no part.