NORTHERN STATES POWER
COMPANY, Appellant,

v.

Bruce HAGEN, Leo Reinbold, and Richard Elkin, as members of the North Dakota Public Service Commission, The City of Fargo, The Fargo Park District, The City of Grand Forks, and North Dakota Community Action Association, Respondents.

In the Matter of the Complaint of The CITY OF FARGO Regarding Natural Gas Rates Charged by Northern States Power Company in State of North Dakota.

Civ. No. 10061.

Supreme Court of North Dakota.

Jan. 11, 1982.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, and Gene R. Sommers, Minneapolis, Minn., for appellant; argued by R. W. Wheeler, Bismarck.

Daniel S. Kuntz, Asst. Commerce Counsel, Public Service Commission, argued, Bismarck, for respondent, Public Service Commission.

Myer Shark, argued, Fargo, for respondent, The City of Fargo and The Fargo Park District.

Jay Fiedler, City Atty., argued, Grand Forks, for respondent, City of Grand Forks.

Susan W. Rester, National Consumer Law Center, Boston, Mass., for respondent, North Dakota Community Action Ass'n.

PAULSON, Justice.

Northern States Power Company (NSP) appeals from the judgment entered on July 16, 1981, in the District Court of Burleigh County, which affirmed the March 2, 1981, decision and order of the North Dakota Public Service Commission. We reverse and remand.

Northern States Power Company is an investor-owned utility company incorporated in Minnesota. NSP and its wholly-owned subsidiary, Northern States Power Company-Wisconsin (NSP-Wis), operate natural gas distribution systems in North Dakota, Minnesota, and Wisconsin. NSP does not produce natural gas, but rather purchases gas from wholesale pipeline suppliers and resells that gas to its retail customers.

The natural gas used to supply NSP's distribution systems is purchased from two pipeline companies, Northern Natural Gas Company (Northern Natural) and Midwestern Gas Transmission Company (Midwestern). The gas supplied by Northern Natural is distributed to several cities in central Minnesota, including St. Paul, and to LaCrosse and Hudson, Wisconsin. The gas supplied by Midwestern is distributed primarily to Fargo and Grand Forks in North Dakota, to Moorhead and East Grand Forks in Minnesota, and to Eau Claire, Wisconsin. Approximately 213,000 of NSP's natural gas customers receive gas supplied by Northern Natural, and approximately 26,000 NSP customers receive Midwestern gas. Northern Natural and Midwestern each have long-term contracts to supply specified daily volumes of gas to NSP.[1]

Northern Natural secures its gas from domestic supplies, whereas Midwestern relies exclusively on gas imported from Canada as its supply source. Due to policies of the Canadian government, the price of imported Canadian natural gas has risen dramatically in the past several years in com-

---

1. NSP's contract with Midwestern Gas Transmission Company extends through December of 1985. The PSC order in this case, requiring that NSP's natural gas rates be rolled in, would not affect or alter NSP's liability under that contract in any way. The PSC order does not purport to alter rates paid by NSP to its pipeline suppliers for natural gas, but rather requires that the costs incurred under those contracts be spread among all of NSP's retail natural gas customers.

parison with domestic natural gas prices. As a result, there has been an increasing disparity in the price which NSP pays to Northern Natural and Midwestern for natural gas. During the first eleven months of 1980, NSP paid an average of $2.09 per Mcf for domestic gas supplied by Northern Natural, whereas it paid an average of $4.48 per Mcf for the imported Canadian gas supplied by Midwestern. Because NSP's existing retail natural gas rates are based upon a direct assignment of the wholesale purchase price of gas to the distribution areas served by that gas, a similar price disparity exists in the retail gas rates charged by NSP to its customers supplied by Northern Natural and Midwestern, respectively. The record indicates that, at the time of the hearing before the Public Service Commission in this case in early 1981, the average NSP residential gas customer in Fargo or Grand Forks was paying $5.92 per Mcf for gas, whereas the average residential customer on NSP's Northern Natural distribution system in Minnesota was paying only $3.89 per Mcf.

In December of 1980, the City of Fargo filed a complaint with the North Dakota Public Service Commission (PSC), alleging that the direct assignment of the cost of high-priced imported gas to customers on NSP's Midwestern distribution system was unreasonable and discriminatory. The City of Fargo requested that the PSC require NSP to average, or "roll-in," its purchase cost for all gas supplies in setting rates, and thereby minimize the disparity between rates charged on its two distribution systems.

The City of Grand Forks and the Fargo Park District petitioned to intervene in the proceeding, and these petitions were granted by the PSC. The PSC found that an emergency existed, warranting an accelerated hearing schedule, and a three-day hearing was held January 20–22, 1981. On March 2, 1981, the PSC issued its findings of fact, conclusions of law, and order directing NSP to file revised rate tariff schedules based on average purchased gas price. NSP appealed to the District Court of Burleigh County, and the district court entered judgment on July 16, 1981, affirming the PSC ruling. On July 17, 1981, NSP filed a notice of appeal to the supreme court.

Our scope of review in this case is limited by statute. Section 28–32–21 of the North Dakota Century Code provides:

"28–32–21. Review in supreme court. The judgment of the district court in an appeal from a decision of an administrative agency may be reviewed in the supreme court on appeal in the same manner as provided in section 28–32–19, except that the appeal to the supreme court must be taken within sixty days after the service of the notice of entry of judgment in the district court."

Section 28–32–19 of the North Dakota Century Code provides:

"28–32–19. Scope of and procedure on appeal from determination of administrative agency. The court shall try and hear an appeal from the determination of an administrative agency without a jury and the evidence considered by the court shall be confined to the record filed with the court. If additional testimony is taken by the administrative agency or if additional findings of fact, conclusions of law, or a new decision shall be filed pursuant to section 28–32–18, such evidence, findings, conclusions, and decision shall constitute a part of the record filed with the court. After such hearing, the court shall affirm the decision of the agency unless it shall find that any of the following are present:

1. The decision or determination is not in accordance with the law.

2. The decision is in violation of the constitutional rights of the appellant.

3. Provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions and decision of the agency are not supported by its findings of fact.

"If the decision of the agency is not affirmed by the court, it shall be modified or reversed, and the case shall be remanded to the agency for disposition in accordance with the decision of the court."

■ NSP contends that the conclusions and decision of the PSC in this case are not in accordance with the law and are not supported by the findings of fact.[2] In reviewing NSP's contentions, we look to the record compiled before the PSC itself, rather than to the findings of the district court. *North Dakota Real Estate Commission v. Allen*, 271 N.W.2d 593, 595 (N.D.1978).

## I.

NSP initially contends that the PSC erred as a matter of law in concluding that it could roll-in NSP's gas rates without finding that NSP operated an integrated gas distribution system. The PSC concluded that system integration was not a prerequisite to rolled-in rates, and determined that rolled-in rates were justified in this case by (1) the benefits provided by the imported Canadian gas to customers on NSP's Northern Natural distribution system, and (2) fundamental fairness.[3] In support of its conclusion, the PSC points to the decision of the United States Court of Appeals for the Eighth Circuit in *Montana-Dakota Utilities Co. v. Federal Energy Regulatory Commission*, 631 F.2d 557 (8th Cir. 1980) (hereinafter "*MDU v. FERC*"). NSP argues that *MDU v. FERC* does not stand for the proposition that benefit and fairness alone may be the basis for rolling in rates, inasmuch as the court went on to find that MDU's natural gas system was in fact integrated.

■ We conclude that *MDU v. FERC* supports the PSC's determination that rates may be rolled in based upon benefits and fairness, without a finding of system integration. MDU serves a number of natural gas distribution areas in Minnesota, Montana, North Dakota, South Dakota and Wyoming. All of these distribution systems are connected to MDU's interstate pipeline except for the systems in Sheridan, Wyoming, and Crookston, Minnesota. In 1975 MDU made arrangements with Northern Utilities, Inc., and its affiliate, Northern Gas Company, to supply gas to its Sheridan system through an exchange agreement. Under this agreement, MDU would sell gas from its interstate supply to Northern Gas Company and, in return, Northern Utilities supplied an equivalent amount to the Sheridan system from its intrastate supply. In 1976 MDU acquired, from the so-called "Powell II Unit," an alternative intrastate source for its Sheridan system. Through an intrastate exchange agreement with Northern Utilities, this Powell II gas was supplied to the Sheridan system. In 1977 FERC issued a permanent certificate authorizing the original 1975 interstate exchange agreement between MDU and Northern Gas Company, but exchanges were authorized only to the extent necessary to make up deficiencies in the intrastate supplies available to the Sheridan system.

Because the price of the intrastate Powell II gas increased at a greater rate than the price of MDU's interstate sources of gas, a price disparity was created. To alleviate the burden placed on its Sheridan system customers by the high-priced Powell II gas, MDU proposed that the additional cost of Powell II gas be spread to all of its natural gas customers.[4] The public service commis-

2. In addition to the issues discussed in the text, NSP contends that the PSC's decision resulted in an unconstitutional confiscation of property and that the accelerated hearing schedule deprived NSP of its right to a fair hearing. Because we reverse on other grounds, we find it unnecessary to discuss these issues.

3. All of the parties to this appeal have, in their briefs and at oral argument, discussed system integration at great length. The PSC, however,

specifically left undecided the question of whether NSP's natural gas system is integrated, and based its decision and order on benefits and fairness. Thus, the issue of integration of NSP's natural gas distribution system is not before the court at this time.

4. Initially, MDU had proposed to average gas costs among its Wyoming customers only. The Wyoming Public Service Commission denied this request, and ordered that costs be spread

sions of Wyoming, Montana, North Dakota, and South Dakota approved rolled-in rates in their jurisdictions. FERC, however, denied MDU's request for rolled-in rates as to interstate sales. MDU appealed this decision to the United States Court of Appeals for the Eighth Circuit.

The court reversed FERC's denial of rolled-in rates, holding that fundamental fairness and the benefits provided to interstate customers by the Powell II gas required that the cost of the Powell II gas be allocated to all customers on MDU's gas distribution systems. The court found that MDU had a responsibility, albeit unexpressed, to supply the Sheridan system with gas from its interstate supply in the event of a shortage in intrastate gas supplies available to the Sheridan system. Thus, MDU would be required to curtail service to some of its low-priority interstate customers if the Powell II gas supply were unavailable. The court therefore concluded that MDU's interstate system derived a benefit from the availability of Powell II gas.

The court also determined that fundamental fairness required that the cost of the Powell II gas be spread among all of MDU's natural gas customers. The court noted that FERC's decision allowed MDU's interstate customers to escape paying the costs that all other customers were paying, as the public service commissions of the affected states had already approved rolled-in rates in their respective jurisdictions.

NSP contends that the court's decision in *MDU v. FERC* does not support an independent "benefit and fundamental fairness" theory as a basis for rolling in rates, because the court went on to find that the Sheridan system was part of MDU's "integrated system." A careful reading of the court's opinion, however, indicates that the court's conclusion that the Powell II gas costs should be rolled in was not based upon

system integration. The determination of integration was relevant only because MDU's interstate tariff allowed adjustments in the PGA (Purchased Gas Adjustment) clause only to reflect changes in the average cost of purchased gas on its "integrated system." Because rates for MDU's interstate customers were governed by the tariff on file with FERC, a determination of system integration was necessary to ensure compliance with the tariff.[5] This determination, however, was separate and distinct from the court's conclusion that rolled-in rates were justified by benefit and fundamental fairness. We therefore agree with the PSC that the court's opinion in *MDU v. FERC* supports an independent "benefits and fundamental fairness" test as the basis for rolling in rates.

We hold that rates may be rolled in when (1) it is established that the availability of the higher-priced gas provides a tangible benefit to the consumers who will be allocated a portion of its cost, and (2) fundamental fairness requires sharing of those costs. The "benefits and fairness" test allocates the costs of a given facility or commodity among those customers who derive some measure of benefit from its availability. In fact, system integration may be justified as a basis for rolled-in rates only to the extent that it indicates that benefits are shared by all customers on the system. It would be inequitable to allocate costs of commodities or facilities of an integrated system to customers who do not derive some benefit from those commodities or facilities. Thus, we conclude that a finding of an integrated system is not a prerequisite to rolled-in rates. We note, however, that a finding that a system is not integrated is also a factor to be considered in determining whether or not rates should be rolled in based upon benefits and fairness.[6]

throughout MDU's gas distribution system. MDU then went to the other state commissions requesting rolled-in rates, and the other state commissions complied.

**5.** We are unaware of any similar tariff restrictions involved in this case, and thus a determination of system integration for this purpose is unnecessary.

**6.** *See* footnote 3.

## II.

NSP also contends that the PSC's decision is not supported by its findings of fact. Section 28–32–19, N.D.C.C., requires that this court reverse or modify the agency decision if we find that the conclusions and decision of the agency are not supported by its findings of fact. In this case we find that the PSC's conclusion that natural gas rates should be rolled in is not supported by its findings of fact.

■ Specifically, NSP contends that the benefits which the PSC found as fact are too intangible and insufficient to support its conclusion that rates should be rolled in. The PSC claims that the question of sufficiency of benefits to support rolling in rates is an administrative question of fact which may only be overturned on appeal if it is unsupported by the record. We disagree. As we stated in *Slope County v. Consolidation Coal Co.*, 277 N.W.2d 124, 127 (N.D.1979), quoting with approval from *Henzel v. Cameron*, 228 Or. 452, 463, 365 P.2d 498, 503 (1961):

> " 'Whether a finding is a "finding of fact" or a "conclusion of law" depends upon whether it is reached by natural reasoning or by fixed rules of law. Where the ultimate conclusion can be arrived at only by applying rules of law the result is a "conclusion of law." ' "

The determination of the sufficiency of benefits to support rolled-in rates is an "ultimate conclusion" which "can be arrived at only by applying rules of law." Thus, it is clearly a question of law. Decisions of administrative agencies on questions of law are fully reviewable by this court on appeal. *State Hospital v. North Dakota Employment Security Bureau*, 239 N.W.2d 819, 822 (N.D.1976).

We have in the past overturned conclusions of administrative agencies which were not supported by its findings of fact. For example, in *Mills v. Board of County Commissioners*, 305 N.W.2d 832, 836–837 (N.D. 1981), we held that the facts as found by the Tax Appeals Board did not support its conclusion that the taxpayer in question was a "farmer" as that term was defined in the statute.

In the instant case, the PSC concluded that there were numerous benefits which were provided to NSP's Northern Natural customers by the availability of the imported Canadian gas. The benefits found by the PSC may be briefly summarized as follows:

1. Costs of NSP's administrative facilities, personnel, and expenses are shared by customers on both distribution systems. Because loss of Canadian gas would result in a loss of gas customers, there would be fewer customers over which to spread fixed operating costs.

2. NSP as a whole is liable on its gas supply contracts; thus, if NSP lost customers on its Midwestern system, the company would still be liable for the purchase price of its daily contractual allotment from Midwestern, and NSP's Northern Natural customers would be forced to pay a portion of those costs.

3. Midwestern Gas Transmission Company has on occasion sold imported Canadian gas to Northern Natural Gas Company.

4. In 1977–78, Northern Natural Gas acquired so-called "FERC 268" gas for emergency purposes, and a portion of this gas was transferred for use by NSP on its Midwestern distribution system.

5. NSP has in the past transferred "peak-shaving"[7] gas from its facilities in the St. Paul area for use on its Midwestern distribution system.

---

7. "Peak-shaving" refers to various methods by which natural gas distributors obtain additional gas supplies for use when their daily allotments from pipeline suppliers are insufficient to meet customer requirements. The transfer of peak-shaving gas from the Northern Natural system to the Midwestern system is accomplished by displacement. Propane-air produced by NSP at its facility near St. Paul is used on its North-

ern Natural system, and NSP simultaneously reduces the daily volume which it is entitled to receive from Northern Natural in an equal amount. This volume is then transported by Northern Natural and delivered to Midwestern at the pipeline connection at North Branch, Minnesota. Midwestern then allows NSP to exceed its daily allotment on the Midwestern system by an equal volume.

6. In the years 1972 through 1975, NSP transferred liquefied natural gas from its Eau Claire, Wisconsin, facility on the Midwestern system for use as peak-shaving gas on its Northern Natural system.

7. Currently, NSP has pending with FERC a request to transfer a portion of its domestic gas supply from Northern Natural for use on its Midwestern system.

8. There is a potential for using surplus Canadian gas from the Midwestern system for peak-shaving purposes on the Northern Natural system.

9. There is a benefit provided to this region of the country from having additional supplies of gas available.

■ The PSC contends that the benefits provided to NSP's Northern Natural system customers need not be equal to nor even of the same magnitude as those realized by customers on the Midwestern system. In *LaRowe v. Kokomo Gas and Fuel Co.*, 386 N.E.2d 965, 975 (Ind.App.1979), the court noted:

"Rates, whether viewed technically as based on cost of service, or, as here, as an addition to cost of service, must reflect a relationship to service or a benefit provided in order not to be unreasonable or to discriminate unduly among classes. Rolled in rates assume that while each customer may not receive identical benefits, each receives some benefits from being a part of the entire system. However, when it is clear that only one group benefits, that group alone should bear the cost and the rates must be 'incremental' rather than rolled in to reflect that cost."

We agree with the reasoning of the Indiana Court of Appeals in the above language— the benefits received by each customer need not be identical before rates may be rolled in. However, we believe that the benefits provided must be more substantial than those found by the PSC in this case.

An examination of the *LaRowe, supra,* and *MDU v. FERC, supra,* decisions, which were heavily relied upon by the PSC in its decision, indicates that the benefits found to exist in those cases are much more substantial and direct than those found in this case.

In *LaRowe,* Kokomo Gas and Fuel Company had acquired high-cost natural gas to enable it to continue service to certain industrial customers that would otherwise have been curtailed because of limited gas supplies available from Kokomo's primary supplier. Kokomo's residential customers complained when the price of this additional gas was rolled in, contending that Kokomo's regular supplies were sufficient to serve residential customers and that therefore the high-priced gas was used solely to serve industrial customers. The Indiana Court of Appeals held that the residential customers received benefits from the additional gas in that residential customers would have been curtailed on peak days if the additional gas had not been available and the alternative to purchase of the higher-priced gas would have been an increase in rates. Additionally, the company would have been forced to use substitute gas at a cost two and one-half times greater than the supplemental gas which it purchased, and the cost of the substitute gas would have been spread to all of the company's customers.

In *MDU v. FERC, supra,* the benefit relied upon by the court was that the intrastate Powell II gas met a need which MDU would otherwise have been required to meet with its interstate gas. If the Powell II gas had not been available, MDU's low-priority interstate customers would have suffered service curtailments. The court concluded that, because "the Powell II supply relieves the interstate system of this burden, thereby increasing the amount of gas available to MDU's interstate jurisdictional customers, the interstate system receives a clear benefit from the Powell II gas." *MDU v. FERC, supra* 631 F.2d at 561.

■ The benefits found to exist in this case are clearly not as direct or as tangible as those in *LaRowe* and *MDU v. FERC.* In *LaRowe,* the additional gas was available to

residential customers to avoid possible curtailments and prevented a cost increase to residential customers. In *MDU v. FERC*, the additional intrastate gas relieved interstate customers of possible curtailments. In the instant case, no such direct benefit exists. NSP, as a gas distributor, does not have the authority nor the obligation to transfer domestic gas from its Northern Natural system to its Midwestern system in the event of a shortage. If Canadian gas became unavailable, it would be the obligation of Midwestern, as the pipeline supplier, to secure alternate supplies of gas to provide NSP with sufficient gas to serve its Midwestern customers. Although it is likely that a portion of the gas which would be used in such an emergency would be provided by Northern Natural, this would also be true if any other pipeline supplier in the region faced an emergency shortage. Continuation of service to high-priority customers in the event of an emergency gas shortage is regulated by FERC, and low-priority customers of area pipelines would be curtailed pursuant to the existing federal curtailment priorities.

The only direct benefit which NSP's Northern Natural customers have received from the availability of imported Canadian gas was the transfer of liquefied natural gas from NSP's Eau Claire facility to a storage tank near St. Paul. These transfers occurred in 1972–1975, and were accomplished by liquefying imported Canadian gas from NSP's Midwestern system in Eau Claire and trucking the gas to St. Paul. This gas was then used for peak-shaving purposes on the Northern Natural system. Although this transaction clearly provided a direct benefit to Northern Natural customers at one time, it is insufficient to support rolled-in rates. The last such transfer occurred six years ago, and the record indicates that it is highly unlikely that any similar transfers will take place in the future. A "benefit" which occurred years ago and is unlikely to occur again certainly does not justify rolling in rates at the present time.

The other benefits found by the PSC are similarly insufficient to support rolled-in rates. The sharing of administrative expenses and liability for the company's contractual obligations are not actually related to availability of gas supplies, but exist any time a utility company operates multiple systems. The sale and transfer of Canadian gas from Midwestern Gas Transmission Company to Northern Natural Gas Company was a transaction between the two pipeline companies, and NSP was not involved. This sale created no rights in any of NSP's customers. The transfer of "FERC 268" gas and peak-shaving gas from the Northern Natural system to the Midwestern system creates a benefit only to customers on the Midwestern system; NSP's Northern Natural customers received no benefit from these transactions. The potential benefits provided by the pending proposal before FERC to transfer domestic gas from Northern Natural to the Midwestern system is at present too speculative to be considered a direct benefit.[8] Similarly, the PSC's conclusion that surplus Canadian gas from the Midwestern system could potentially be used for peak-shaving on the Northern Nat-

---

**8.** Although we find that the benefit provided by this potential transfer of gas is too speculative to support rolled-in rates at the present time, we note that the transfer, if approved by FERC, could provide additional benefits to both the Midwestern and Northern Natural systems. It is also possible that this transfer of gas might be further evidence that NSP's total distribution system is integrated. If the standard of integration adopted in *MDU v. FERC* were applied, NSP's system might very well be considered "integrated" based upon these additional transfers. The court in *MDU v. FERC* pointed to two factors in determining that the Sheri-

dan system was part of MDU's total integrated system: (1) the systems were physically connected by the pipelines of non-affiliated companies and gas was readily exchanged between pipelines; and (2) the Sheridan system customers had access to a portion of MDU's overall gas supply. If the proposed transfer of gas between NSP's Northern Natural and Midwestern systems is approved and implemented, the factors noted in *MDU v. FERC* as an indication of system integration might exist on NSP's system. Because the approval of the proposed transfer is at present uncertain, however, we need not decide this issue at this time.

ural system is also merely speculative.[9] NSP would have to gain permission from Midwestern Gas Transmission Company in order to authorize any such transfer. Finally, the benefit which the PSC considered the "biggest benefit" to Northern Natural customers—the increase in regional gas supplies which results from the availability of imported Canadian gas—is a benefit derived from *any* increase in supply for *any* pipeline company in the region. Whenever any regional pipeline supplier obtains additional supplies, all gas customers in the region benefit in some small measure from the increased regional supply. However, this alone is insufficient to justify averaging rates among all of the customers thereby benefited.[10]

We conclude that the benefits found by the PSC are not sufficient to support its conclusion that NSP's natural gas rates should be rolled in.

In addition, the necessary overall authority to meaningfully average rates is lacking.[11]

We therefore reverse the decision of the PSC and the judgment of the district court, and, pursuant to Section 28–32–19, N.D. C.C., remand the case to the PSC for disposition in accordance with this opinion.

ERICKSTAD, C. J., and SAND, J., concur.

McGUIRE, D. J., sitting in place of VANDE WALLE, J., disqualified.

PEDERSON, Justice, dissenting.

"It is not the function of the judiciary to act as a super board of review." *Appeal of Johnson*, 173 N.W.2d 475 (N.D.1970). After concluding that, under the law, "roll-in" rates are warranted if (1) the availability of the higher-priced Canadian gas provides a benefit to *all* NSP customers, and (2) fundamental fairness requires that *all* share in those higher prices, this court should defer to administrative agency expertise in applying these yardsticks to the facts in the case.

Exactly what benefits are "enough benefits" and what, under the circumstances, is fair, would likely differ in the eyes of every beholder. Under the law of this state, the PSC has been directed to make the determination. The judiciary should not interject

---

**9.** The PSC based its finding of this benefit on the fact that NSP occasionally has a surplus of Canadian gas on its Midwestern system at the same time that it is using more expensive peak-shaving propane on its Northern Natural system. The PSC thus concluded that NSP should attempt to persuade Midwestern Gas Transmission Company to allow transfer of surplus Canadian gas to the Northern Natural system when these circumstances arise. Although we agree with the PSC that NSP should consider such a request, any potential benefits which might flow from such an arrangement are at present too speculative to justify rolling in natural gas rates.

**10.** In reaching the conclusion that the benefits which exist in this case are insufficient to support rolled-in rates, we have also considered the effect which rolled-in rates would have upon NSP's financial condition. NSP asserts that rolling in natural gas rates in North Dakota would result in a $9.3 million annual revenue loss which it would be unable to recover elsewhere. In support of this argument, NSP points out that the Minnesota Public Utilities Commission and the Wisconsin Public Service Commission have rejected rolled-in rates for NSP's retail natural gas sales in their respective states. The decision of the Wisconsin Public Service Commission has been affirmed by the Court of Appeals of Wisconsin. *See Wisconsin Association of Manufacturers and Commerce, Inc. v. Public Service Commission*, 94 Wis.2d 314, 287 N.W.2d 844 (1979), *appeal dismissed as moot*, 100 Wis.2d 300, 301 N.W.2d 247 (1981). NSP contends that it is thus precluded from recovering the projected $9.3 million loss from its natural gas customers in Minnesota and Wisconsin. Although we have considered NSP's projected revenue loss as a significant factor in our conclusion that the benefits which exist in this case do not support rolled-in rates, we note that conflicting state regulation and the resulting revenue loss to NSP does not *compel* the result which we reach today.

**11.** In order to accomplish true and meaningful averaging, it would be necessary to control or fix the rates in the other jurisdictions in which the rates are used to determine the average. Averaging unilaterally can be accomplished only after the fact—that is—when the other jurisdictions have fixed their rates. This would not constitute true averaging but, in reality, would permit the other jurisdictions to determine to a great degree the rates in North Dakota.

its judgment. The PSC determination should be affirmed.

McGUIRE, District Judge, separate concurring dissent.

After concluding that case law supports the PSC's determination that rates may be rolled in based upon benefits and fairness, without the necessity of a finding of integration, the majority obviates the PSC's finding of sufficiency of benefits, although the majority admits benefits do exist. This the Court does by the machination of changing the PSC's finding into a conclusion of law to enable the Court to fully review the sufficiency of benefits issue. As the majority points out, the method of review, including the weight of the evidence, is well established as set out in Sections 28–32–21 and 28–32–19 of the North Dakota Century Code. In its review the Court is to apply the "preponderance of evidence" test. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979); *American State Bank of Williston v. State Banking Board of North Dakota,* 289 N.W.2d 222 (N.D.1980). The scope of review is extremely narrow and it is not the reviewing Court's place to make new independent findings, nor is the Court supposed to substitute its judgment on the facts found by an agency, such as the PSC, when the agency obviously has special expertise in the area of concern. The scope and nature of this Court's review is adequately and succinctly set forth in the case of *Geo. E. Haggart v. North Dakota Work. Comp. Bur.,* 171 N.W.2d 104 (N.D. 1969), wherein this Court stated:

"The primary limitation upon power of the Court to review is in regard to matters calling for the exercise of expert judgment which are committed to the discretion of the administrative agency. Thus, judicial review is extremely limited in regard to findings of fact and to expert judgments of an administrative agency acting within its statutory authority."

I would leave the PSC's findings of fact and conclusions as they are, supported by the evidence and by the law respectively. I would affirm the PSC's determination and find it in full compliance with the pertinent law.

I therefore enter my dissent and concur with Justice Pederson's dissent as this Court should not substitute its own judgment for that of the commission. For the reasons as stated above and for the reasons as stated in Justice Pederson's dissent the PSC's determination should be affirmed.