ST. PAUL AREA CHAMBER OF COMMERCE v.
MINNESOTA PUBLIC SERVICE COMMISSION.
MINNESOTA PUBLIC INTEREST RESEARCH GROUP,
INTERVENOR-APPELLANT.
CITY OF ST. PAUL, INTERVENOR-APPELLANT.

251 N. W. 2d 350.

February 25, 1977—Nos. 47031, 47046, 47061, 47126.

*Warren Spannaus,* Attorney General, and *Jerome L. Getz,* Assistant Attorney General, for appellant commission.

*Elliot Rothenberg,* for intervenor-appellant Minnesota Public Interest Research Group.

*Harriet Lansing,* City Attorney, and *Thomas J. Stearns,* Assistant City Attorney, for intervenor-appellant City of St. Paul.

*O'Connor & Hannan, Richard G. Morgan, John J. Sommerville,* and *Nancy F. Fowler,* for respondent.

*Warren Spannaus,* Attorney General, *Richard B. Allyn,* Solicitor General, and *Stephen Shakman,* Special Assistant Attorney General, amicus curiae, seeking reversal.

*Briggs & Morgan, Leonard J. Keyes, A. R. Renquist, D. A. Lawrence,* for Northern States Power Company, amicus curiae, seeking affirmance.

SCOTT, JUSTICE.

These are appeals from a judgment of the Ramsey County District Court wherein it modified the allocation of revenue responsibility rates among customer classes as ordered by the Minnesota Public Service Commission under the Public Utilities Act, Minn. St. c. 216B, and imposed a new rate allocation. We reverse.

On January 2, 1975, Northern States Power Company (NSP) filed with the Public Service Commission (commission) an application for a change in rates, together with supporting schedules and written testimony. Hearings on the application were conducted in two phases, the first primarily concerned with revenue and the second with rate structure. Four hearings were

held at which members of the public could testify; in all there were 26 days of hearings from June 3 to September 11, 1975.

The commission issued its findings of fact, conclusions of law, and order on October 31, 1975. The decision consists of two parts, only the latter of which is at issue on appeal: (1) the NSP-requested revenue increase of $60,000,000 was reduced to $38,640,000, for an average rate increase of 10.4 percent, (2) the NSP-proposed rate structure was modified, thereby reallocating the burden among the various consumer classes. The chart below, prepared by the commission, shows how the rate structure was altered:

| | NSP Proposed | | Commission Determination | |
|---|---|---|---|---|
| Class | $ Millions | % Increase | $ Millions | % Increase |
| Residential | 23.0 | 15.8 | 11.5 | 7.9 |
| Small C & I | 10.3 | 13.8 | 3.9 | 5.3 |
| Large C & I | 24.9 | 17.8 | 21.4 | 15.3 |
| Public Lighting | 1.0 | 16.0 | 1.0 | 16.0 |
| Other Public Sales | .8 | 15.9 | .8 | 15.9 |
| TOTAL | 60.0 | 16.1 | 38.6 | 10.4 |

The basis for the NSP structure was essentially cost of service, that is, the rate charged to a given class was set proportional to the cost of delivering electricity to that class. The commission, while acknowledging the importance of cost of service as a criterion, indicated that it would also consider four additional factors in establishing the rate structure: (1) the ability to pay the increases, (2) the ability to "pass on" the increases, (3) the ability to "write off" electric costs on taxes, (4) the value of service to the customer. These factors, the commission felt, justified it in placing a greater share of the burden of the increase on large commercial and industrial users, while correspondingly lessening the burden of the increase on residential users.

The St. Paul Area Chamber of Commerce (St. Paul Chamber) and the Minneapolis Association of Building Owners and Managers filed petitions for rehearing which challenged the commission's rate schedule. On December 10, 1975, the commission issued supplemental findings and denied the petitions for rehearing. The St. Paul Chamber then brought an appeal to the district court.

The district court of Ramsey County issued its opinion and order on June 21, 1976. Its decision has three essential parts: (1) the scope of review for commission decisions is governed by the Administrative Procedure Act, Minn. St. 15.0425, making the "substantial-evidence" test appropriate, (2) the commission's rate structure was not supported by substantial evidence in the record, (3) the commission's structure was to be modified to conform to the evidence. The district court accepted the commission's revenue determination at $38.64 million, but rejected its use of noncost factors to place a greater share of the increase on the large commercial and industrial users. The court constructed its own allocation of the increase, incorporating parts of both the NSP proposal and the commission's structure. The chart below, prepared by the district court, demonstrates these changes:

| | NSP Proposed | | Commission Determination | | Court Extension of NSP Proposal | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| Class | Millions | Increase | Millions | Increase | Millions | Increase |
| Residential | 23.0 | 15.8 | 11.5 | 7.9 | 14.81 | 10.2 |
| Small C & I | 10.3 | 13.8 | 3.9 | 5.3 | 6.63 | 8.9 |
| Large C & I | 24.9 | 17.8 | 21.4 | 15.3 | 16.04 | 11.5 |
| Public Lighting | 1.0 | 16.0 | 1.0 | 16.0 | .64 | 10.2 |
| Other Public Sales | .8 | 15.9 | .8 | 15.9 | .52 | 10.1 |
| TOTAL | 60.0 | 16.1 | 38.6 | 10.4 | 38.64 | 10.4 |

The overall effect was to restore the relative increases for residential and large commercial and industrial users originally proposed by NSP based solely upon the cost-of-service criterion. The district court held that the commission allocation was unreasonably preferential and discriminatory in that it relied upon "social judgments" not supported by record evidence and therefore exceeded the legislative powers of the commission.

The issues considered on these appeals are:

(1) What factors may be considered by the Public Service Commission in the allocation of rate increases among consumer classes?

(2) What standard of review is to be applied by the district court when the Public Service Commission is challenged on its rate determination?

■ As we have said in previous cases of this kind, ratemaking is an inherently legislative function not to be exercised by the courts. State v. Tri-State T. and T. Co. 204 Minn. 516, 284 N. W. 294 (1939); State and Port Authority of St. Paul v. N. P. Ry.Co. 229 Minn. 312, 39 N. W. 2d 752 (1949); Minneapolis St. Ry. Co. v. City of Minneapolis, 251 Minn. 43, 86 N. W. 2d 657 (1957). We recently reaffirmed this principle in Northwestern Bell Telephone Co. v. State, 299 Minn. 1, 28, 216 N. W. 2d 841, 857 (1974):

"* * * Ratemaking is a legislative and not a judicial function. In complex cases such as this, the court should, and does, accord the commission great deference in reviewing its decision. The rates fixed by the commission are presumed to be reasonable and just until the contrary is shown by clear and convincing evidence. In this area, the court's only function is to protect constitutional rights and not to substitute its own judgment for that of the commission. State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294 (1939); Minneapolis St. Ry. Co. v. City of Minneapolis, 251 Minn. 43, 72, 86 N. W. 2d 657, 676 (1957). We do not find a rate of return of 7.5 percent of trended value to be unjust, unreasonable, or discriminatory, and therefore affirm."

The process of establishing rate allocations among diverse consumer classes is one requiring both technical expertise on the one hand and a careful balancing of many complementary and competing interests on the other. In recent years such paramount factors as the prevention of environmental pollution and the conservation of our energy resources have been added to the equation whenever decisions regarding electricity must be made. We therefore cannot agree with the position taken by the district court and by the St. Paul Chamber that the commission is limited to considering only factors on which substantial evidence has been presented. This may well be the case with the cost-of-service criterion, which has historically been the basis for electric rate structures in Minnesota. We believe it to be in the public interest, which the legislature was surely intending to serve in the broadest sense by establishing the Public Service Commission, that the commission be allowed within the bounds of reasonableness to consider both facts within its expertise and facts of common knowledge in arriving at its decisions in the ratemaking area.[1]

As to the first of these categories, we must presume that the members of the commission itself, with their supporting staff, have in their grasp practical knowledge in the field of utilities regulation not possessed by either the courts or laymen in general. This is the same presumption which courts have always made with regard to the legislature and its delegated agencies, most especially in areas where special knowledge and expertise are required. The field of electric power regulation is no different in this respect, and indeed has become even more complex as energy costs have soared and resources have become scarce.

---

[1] This intent is clearly spelled out in Minn. St. 216B.03:

"Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, *shall be just and reasonable.* Rates shall *not be unreasonably* preferential, *unreasonably* prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of consumers. Any doubt as to reasonableness should be resolved in favor of the consumer. * * *." (Italics supplied.)

The commission, in order to carry out its mandate from the legislature to establish "just and reasonable" rates, must be able to draw on its own internal sources of knowledge and experience. As with the legislature itself, we assume that it does so in each instance and that we ought not to interfere unless it should clearly exceed its statutory powers.

As to the latter category, we must further grant to the commission the capacity akin to the doctrine of "judicial notice"—the process whereby a court acknowledges facts of common knowledge which may not have been introduced in evidence through witnesses. In the present case, for example, it is a matter of common knowledge that the custom of the commercial users is to employ electrical energy profitably, deduct the expense of such energy as a cost of doing business for income tax purposes, and add the residual cost to the price of the service or product which they produce, while it is similarly known that private consumers of electricity cannot so deduct or pass on electrical costs. Such facts allow the inference that in the majority of cases a rate increase must be fully paid for in cash by residential consumers, who may also end up paying for a portion of the commercial rate increase due to the pass-on effect just described. It is not a leap of logic to then say that for the most part commercial users of electricity are more "able to pay" a rate increase than residential users. While such assumptive reasoning would not ordinarily be employed by a court, which must in most cases confine itself to the evidence, it may be legitimately employed by a legislative agency attempting to serve the public interest at large in a way that courts cannot.

It therefore follows that in deciding how to allocate additional electric costs, the commission may consider factors drawn from its own expertise, from facts generally in the public knowledge, and from the evidence presented to it in more formal processes. Unless the commission can be shown to have relied upon certain factors to the extent that clear injustice has resulted, or that its legislative authority has been clearly exceeded, we hold that the

courts may not restrict the scope of matters which the commission may consider in allocating electric costs among classes of consumers.

Interested parties adversely affected by a rate structure which discriminates between commercial and noncommercial users should have, and in this case did have, an opportunity to present evidence before the commission in support of a claim that discrimination in rates between commercial and noncommercial users is unreasonable, or that any discrimination exceeding a fixed level of difference would be unreasonable. Evidence could be introduced, for example, to establish that a difference in rates based on factors other than the cost of furnishing the service to the user would be unfair, inequitable, and unreasonable in a particular situation. The commission would then be required to evaluate the evidence so offered together with facts commonly known. In the event of an appeal to the district court, that court would be required to assess the facts commonly known, together with the facts offered in evidence, and decide whether the rate structure established by the commission was established at a reasonable and rational level having support in the evidence.

We therefore agree with the reasoning expressed by the United States Supreme Court in the Permian Basin Area Rate Cases, 390 U. S. 747, 815, 88 S. Ct. 1344, 1385, 20 L. ed. 2d 312, 363 (1968):

"* * * Although the [Federal Power] Commission's exposition of these questions might have been more carefully drawn, it has quite appropriately incorporated in its calculations factors other than producers' costs. Cost and noncost factors do not, as the Court of Appeals supposed, race one against the other; they must be, as they are here, harnessed side by side. The Commission's responsibilities necessarily oblige it to give continuing attention to values that may be reflected only imperfectly by producers' costs; a regulatory method that excluded as immaterial all but current or projected costs could not properly serve the consumer interests placed under the Commission's protection.

We have already considered each of the points at which the Commission has given weight to noncost factors, and have found its judgments consistent with the terms and purposes of its statutory authority."

■ The district court relied upon our decision in Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 180 N. W. 2d 175 (1970), in holding that the "substantial-evidence" test as set out in Minn. St. 15.0425 of the Administrative Procedure Act, applied to rate determinations by the commission. NSP, in its brief amicus curiae, goes so far as to state that this case is "controlling." We do not believe our decision in Minneapolis Van can be read so broadly, nor can our more recent decision in State v. Northwestern Bell Telephone Co. 310 Minn. 146, 246 N. W. 2d 28 (1976), be read to extend Minneapolis Van on this point.

In Minneapolis Van we held that the Administrative Procedure Act, specifically § 15.0425, made the substantial evidence test applicable to *factual* findings by the commission:

"The statutory rule also settles any doubt of our conformity with the majority of courts, both state and Federal, in accepting the substantial-evidence rule as the rule governing the scope of all *judicial review of evidence supporting factual findings of administrative agencies*. 4 Davis, Administrative Law Treatise, § 29.11. As Professor Davis points out in chapter 29 of his comprehensive treatment of this subject matter, substantial evidence is more than 'a scintilla' and is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' § 29.02. The main inquiry by the district court is 'whether on the record * * * [the commission] could reasonably make the finding.' § 29.01. While the test is 'vague, rather than precise' and the 'intensity of review' may vary from case to case, § 29.11, the 'test is the same as the test on review of a jury verdict, but the review is narrower than the review of the findings of a judge sitting without a jury,' § 29.01, the latter

being governed by the 'clearly erroneous' test. § 29.11. The burden is upon the appellant to establish that the findings of the commission are not supported by the evidence in the record, considered in its entirety. If the evidence is conflicting or the undisputed facts permit more than one inference to be drawn, the findings of the commission may not be upset and the district court may not substitute its judgment for that of the commission." 288 Minn. 298, 180 N. W. 2d 177. (Italics supplied.)

The following language from Northwestern Bell makes clear that it does not extend the applicability of Minneapolis Van:

"Ordinarily the broad language of § 15.0425, by its terms applicable to 'any proceedings for judicial review by any court of decisions of any agency,' could be construed as manifesting a legislative intention that this general enactment prevail over the negative implications of § 237.25. Such a principle of statutory construction is stated in Minn. St. 645.26, subds. 1 and 4. Thus, we have held in Minneapolis Van &.Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 180 N. W. 2d 175 (1970), that the 'substantial evidence' standard in § 15.0425(e) governs the scope of review of commission orders rather than the 'any evidence' standard derived from § 216.25 as interpreted in Dahlen Transport, Inc. v. Hahne, 261 Minn. 218, 112 N. W. 2d 630 (1961). At least with respect to the *scope of review of evidentiary determinations,* therefore, the Administrative Procedure Act will prevail over apparently conflicting statutory provisions dealing with appeals from decisions of the commission." 310 Minn. 150, 246 N. W. 2d 30. (Italics supplied.)

Taken together, these two decisions make the substantial-evidence test of § 15.0425 applicable to commission decisions only when it is acting in a quasi-judicial manner, in a role similar to that of a trial judge sitting without a jury. In cases where the commission acts primarily in a judicial capacity, that is, hearing the views of opposing sides presented in the form of written and oral testimony, examining the record, and making findings of

fact, the administrative process is best served by allowing the district court to apply the substantial evidence standard on review. This is so because in such a case the district judge is able to review all of the evidence as he would in any trial and can, within the knowledge parameters of his own expertise, determine whether or not each finding is supported by substantial evidence. There is no policy reason why the commission's finding should not be required to satisfy the substantial-evidence test on this issue. The absence of challenge to this aspect of the commission's decision indicates the parties are satisfied it was supported by substantial evidence.

As our previous discussion makes clear, however, rate allocation is not a judicial or quasi-judicial function. Once revenue requirements have been determined it remains to decide how, and from whom, the additional revenue is to be obtained. It is at this point that many countervailing considerations come into play. The commission may then balance factors such as cost of service, ability to pay, tax consequences, and ability to pass on increases in order to achieve a fair and reasonable allocation of the increase among consumer classes. This determination must result in rates which are "just and reasonable" and rates "shall not be unreasonably preferential, unreasonably prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of consumers." Minn. St. 216B.03. It is clear that when the commission acts in this area it is operating in a legislative capacity, as the above cases have stated. The careful balancing of public policies and private needs is not a matter for the courts, unless statutory authority has been exceeded or discretion abused. As to rate allocations, the teaching of Northwestern Bell Telephone Co. v. State, 299 Minn. 1, 28, 216 N. W. 2d 841, 857, remains the law: "The rates fixed by the commission are presumed to be reasonable and just until the contrary is shown by clear and convincing evidence." The function of the district court is not to "substitute its own judgment for that of the commission," but is only to ensure that the rate structure adopted by

the commission is not "unjust, unreasonable, or discriminatory." *Ibid.* The burden is upon those who would challenge a commission allocation to show by clear and convincing evidence that the allocation contravenes the requirements of § 216B.03. In ascertaining whether or not the statute has been contravened, the district court must give wide latitude to the commission in allowing it to consider many factors which might not ordinarily be considered by a court, as we have explained above. This is so because, while the court is qualified to review agency findings when an agency acts in a quasi-judicial manner in factual matters, it is not so qualified to review legislative judgments when social policies must be weighed in the balance.

Our analysis comports with that established by the United States Supreme Court in the Permian Basin Area Rate Cases, 390 U. S. 747, 767, 88 S. Ct. 1344, 1360, 20 L. ed. 2d 312, 336. In reviewing a Federal Power Commission rate decision under the Natural Gas Act, the Supreme Court stated:

"Section 19(b) of the Natural Gas Act provides without qualification that the 'finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.' More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' *FPC v. Hope Natural Gas Co., supra,* at 602. We are not obliged to examine each detail of the Commission's decision; if the 'total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.' *Ibid.*

"Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas

Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' *FPC v. Natural Gas Pipeline Co.*, 315 U. S. 575, 585. No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests. It is on these premises that we proceed to assess the Commission's orders."

We adopt this reasoning as the standard in Minnesota when courts are called upon to review the allocation of rate increases among consumer classes.

Combining this rule with that adopted above for factual determinations, we may summarize as follows:

(a)   When the Public Service Commission acts in a judicial capacity as a factfinder, receives evidence in order to make factual conclusions, and weighs that evidence as would a judge in a court trial, it will be held on review to the substantial-evidence standard.

(b)   When the Public Service Commission acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decisions will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

In the present case the district court subjected the commission's rate structure to the substantial-evidence test. Under the preceding analysis, this was error requiring reversal. The usual course in a case of this type would be remand to the district court for a review of the evidence under the proper standard. We do not follow this procedure because it now appears that this case has become moot as to the 1975 rate increase. The district court decision below was rendered June 21, 1976, by which time NSP

had already put into effect a new interim increase pursuant to a refund condition under Minn. St. 216B.16. This "1976 increase" is now before the commission, which expects to render a decision in the near future. In sum, the 1975 rate structure as determined by the district court has never been put into effect, nor will it be. If the commission's decision in the 1976 case is appealed to the district court, this opinion will control its review.

Despite the fact that no remand will be made in the present case, we find it appropriate to comment upon the disposition made by the court below. While it is true that Minn. St. 15.0425 provides modification as one of the options available to the district court, we believe this option ought not be exercised in the establishment of rate structures. In such cases the administrative process is best served by remand to the commission if the district court should find that it exceeded its authority or abused its discretion under the standards we have herein adopted. The reversal and modification alternatives should be used only when the commission acts in a judicial capacity as a factfinder, when the district court may review the record and apply the substantial-evidence standard.

Reversed.