**RESERVE MINING COMPANY,**
**Appellant,**

**v.**

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent,**

**Peoples Natural Gas Company, Division of InterNorth, Inc., Respondent.**

**UNITED STATES STEEL CORPORATION, Appellant,**

**v.**

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent.**

Nos. C2–82–1123, C5–82–1181.

Supreme Court of Minnesota.

June 3, 1983.

---

Hanft, Fride, O'Brien & Harries, Edward T. Fride, Duluth, Steer, Strauss, White & Tobias by James J. Ryan, Cincinnati, Ohio, for Reserve Mining.

Wayne L. Emery, Kenneth R. Pepperney and Susan L. Rockwell, Pittsburgh, Pa., Ronald J. Fischer, Duluth, for U.S. Steel Corp.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman and James T. Jarvis, Sp. Asst. Attys. Gen., St. Paul, for resp. MN Pub. Utilities Comm.

Oppenheimer, Wolff, Foster, Sheppard & Donnelly by Elmer B. Trousdale, St. Paul, and Craig J. Fecker and Colleen A. Lamont, Omaha, Neb., for Peoples Natural Gas.

AMDAHL, Chief Justice.

Peoples Natural Gas Company (Peoples) is an investor-owned gas utility engaged in the business of selling natural gas to retail customers in Minnesota and other states. On December 1, 1980, Peoples filed a rate change notice with the Minnesota Public Utilities Commission (PUC). In accordance with the procedure set forth in Minn.Stat. § 216B.16, subd. 2 (1980), the rate change was first suspended and then reinstated subject to a refund, and hearings were commenced on April 13, 1981. The PUC accepted the report of the hearing examiner in part, and its order allowing a rate increase to produce an additional $1,452,000 in annual gross revenue was entered on November 25, 1981. An application to the PUC for a rehearing was denied in an order dated January 5, 1982, and, pursuant to Minn. Stat. § 216B.52, subd. 5 (1982), an appeal was then made to the Lake County District Court. The trial court affirmed the decisions of the PUC in their entirety, and appellants then proceeded under Minn.Stat. § 216B.52, subd. 5 (1982), to bring an appeal to this court.

Peoples, an operating division of Inter-North, Inc., sells natural gas primarily to customers located in the southeastern and east central portions of Minnesota. Peoples also serves six communities in the north-western portion of the state, and five large taconite producers located on the Iron Range. Peoples provides natural gas service to these customers through a combination of methods. About 98% of the gas for Peoples' Minnesota operations is purchased from Northern Natural Gas Company (a sister division of InterNorth, Inc.).

With regard to the physical transmission of gas by and between the Northern Natural Gas Company (Northern) and Peoples, which is an important consideration in this appeal, the starting point for discussion is the Northern interstate pipeline which generally extends north from the Iowa border through Rochester and St. Paul, and continues to Duluth and the Iron Range. The great majority of Peoples' customers are served by town distribution pipeline systems which are maintained by Peoples, and which are connected to the Northern pipeline at town plant border stations. There are approximately 86 "separate" town distribution pipeline systems maintained by Peoples in different Minnesota communities which average less than 500 customers each, excluding the large 19,000 customer system serving Rochester. In contrast, several of the taconite companies and approximately 2,100 farm customers receive their natural gas directly through individual taps into the Northern interstate pipeline.

On December 1, 1980, Peoples filed a petition for a rate increase with the PUC in an effort to increase its revenues from overall Minnesota retail sales by $2,121,563. Peo-

ples' rate petition also included proposals for the establishment of six customer classes, including a taconite class, for the application of a uniform rate for all taconite customers, and for a reduction in the number of rate schedules used in servicing all of its Minnesota retail customers.[1] Reasoning that they will operate to charge similarly situated customers the same rate, the PUC found these proposed customer classes and the reduced number of rate schedules to be reasonable, and ordered their implementation.

Peoples' rate petition proposed an increase of $2,121,563 in its revenues from overall Minnesota retail sales. After reviewing the record, the PUC determined that the appropriate revenue increase for Peoples was $1,452,000, which it projected would produce total gross annual revenues from the sale of natural gas of approximately $145,106,000. The PUC then proceeded to allocate the rates which would achieve this revenue among Peoples' six customer classes. The appellants, Reserve Mining Company and United States Steel Corporation, are two of six taconite companies which are grouped for rate-making purposes in the taconite class. Appellants argue that, because it based its rate determinations upon an unreasonable measure of the costs of serving each customer class, the PUC made an unjust and discriminatory rate allocation to the taconite class.

The rates established by the PUC for each customer class were based upon a cost of service study prepared and presented by Peoples. In this study, Peoples first classified or categorized its systemwide costs into three categories: customer costs, capacity or demand costs, and commodity costs.

1. This filing was occasioned, in part, by the decision of this court in *Northern Natural Gas Company v. Minnesota Public Service Commission,* 292 N.W.2d 759 (Minn.1980). *Northern Natural* involved an appeal by Peoples from an order of the predecessor of the PUC which directed that that agency has jurisdiction to regulate sales to those customers receiving their natural gas directly through individual taps into the Northern interstate pipeline. Peoples had apparently been servicing its "direct sale" taconite customers under take-or-pay

contracts, which required the customer to pay for certain minimum quantities of natural gas during a set period of time regardless of the quantity of gas actually used. Peoples' take-or-pay contract rates were apparently negotiated separately with each taconite customer under regulations promulgated by the Federal Energy Regulatory Commission. The proposal for the establishment of a uniform rate for all taconite customers in Peoples' rate petition in the case at bar is made in response to this court's affirmance in *Northern Natural.*

Customer costs are costs related to the number of customers, such as the cost of customer meters. Capacity costs are fixed costs related to the system's ability to deliver gas, such as the cost of the pipes, pumps, and compressors used in the system. Commodity costs are variable costs related to the system's delivery of gas, such as the cost of gas and of repairs to the system. Allocation factors were then applied to distribute these costs, except for the cost of the gas itself, to the customer classes.[2] This method of cost allocation resulted in an assignment to the taconite class of approximately 41% of the total cost of providing natural gas service to all of Peoples' customers. Of Peoples' total projected 1981 sales volume of 55.6 billion cubic feet, approximately 44% is attributable to the taconite customers.

■ The statutory standard under which the PUC acts in allocating rates between natural gas utility customer classes is as follows:

> Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. Rates shall not be unreasonably preferential, unreasonably prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of consumers. Any doubt as to reasonableness should be resolved in favor of the consumer * * *.

Minn.Stat. § 216B.03 (1982). In *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977), this court reiterated the limited scope of review applicable in challenges to PUC rate allocations:

> When the [PUC] acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decisions will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

Under this standard, the PUC's allocation of revenue responsibility is presumed to be reasonable and just, and the burden is on the appellants to show by clear and convincing evidence that the allocation is unjust, unreasonable, or discriminatory. *See Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 9 (Minn. 1980). This deferential standard stems from the recognition that, to facilitate a determination that is both equitable and responsive to the public interest, the PUC must be afforded considerable latitude in combining its technical expertise with its judgments regarding the appropriate balance of competing interests and policies.

■ Appellants' primary argument is that the rates allocated to the taconite class are unjust, unreasonable, and discriminatory because they are based upon an unreasonably disproportionate allocation of the costs of the Peoples' distribution system to the costs of serving the taconite class.[3] Appellants argue that the Peoples' distribution

---

**2.** An allocation factor was derived for each category of costs. Customer costs were allocated according to the number of customers, demand costs according to an average of peak demands, and commodity costs according to annual sales volumes.

**3.** Because the taconite class is comprised of high volume customers (some 44% of Peoples' total volume), and because the actual cost of servicing the taconite customers is relatively low, appellants argue that the allocation of demand costs according to an average of peak demands results in a discriminatorily disproportionate allocation of costs. The only property owned and operated by Peoples which is located at the taconite plant sites and used in transferring the gas from the Northern pipeline to the customer consists of two odorizers, three receivers and four transmitters. The total value of the odorizers and the telemetering equipment is under $19,000, and Peoples spends little to monitor and service this equipment. Excluding gas supply costs, the PUC's calculation of the total cost of service for the taconite class, reflecting an allocation based on average of peak demands, was $1,902,508 annually. On the other hand, the cost of service study submitted by the taconite producers, which attempted to assign direct costs and which did not allocate total demand costs among the separate customer classes, showed a total cost of service to the taconite producers of only $276,943.

system is totally separate from their taps into the Northern pipeline and that it is therefore unreasonable to allocate to them the costs of a system of which they are not, and cannot be, a part. In other words, the taconite appellants view themselves as isolated from Peoples' other customer classes so far as cost allocation is concerned, and urge that a separate cost study should be prepared for them which charges them only with the costs which they claim are directly attributable to them.

The appellants' argument that the cost of providing service should be the single most important consideration in the setting of utility rates undervalues the PUC's obligation to also review and balance noncost factors when determining revenue responsibilities for different classes of customers. This court has recognized that rate levels for a class must ultimately be the product of many countervailing considerations, including noncost factors as well as the results of cost studies. *See St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 260, 251 N.W.2d 350, 357 (1977). For example, one consideration applied by the PUC in its rate determination was the impact a rate change would have on different customers. This factor is appropriate because a precipitous increase in one class' rate when rates charged to other classes are declining, or a decrease in one class' rate when overall costs or marginal costs are increasing, may be unreasonable even though that class is already above the cost of service attributed to it by the appropriate cost study. Another noncost factor considered by the PUC was the volatility of sales to the taconite class. Any unexpected declines in gas sales, caused by the volatility of the taconite market, would result in a loss of earnings to Peoples which would have to be made up by the remaining customer classes. The ability to pay, the ability to pass on the increased cost of energy, and the ability of businesses to realize part of an energy cost increase as an income tax savings are other noncost factors which may be considered by the PUC in assigning revenue responsibilities. *St. Paul Chamber,* 312 Minn. at 260, 251 N.W.2d at 357.

It is clear that the PUC's consideration of such noncost factors played a prominent role in its allocation of rates to Peoples' customer classes. The PUC also reviewed cost factors and concluded that some of the costs of Peoples' distribution system should be allocated to the taconite class because that system does provide a benefit to that class. The PUC's judgment regarding the effect of such factors is a legislative function to which this court must extend considerable deference. Upon this record, we hold that the appellants have not met their burden of proving, by clear and convincing evidence, that the rates established for them by the PUC are unreasonable, based upon all of the factors, cost and noncost, which the PUC may consider in assigning revenue responsibility among customer classes.

Affirmed.