CITY OF MOORHEAD, Appellant
(C5–82–1584, C2–82–1607),

Konrad Olson, Peter Joseph Miller and
FM Apartment Association,
Appellants (C3–83–7),

v.

MINNESOTA PUBLIC UTILITIES COM-
MISSION, Minnesota Department of
Public Service, Northern States Power
Company, City of St. Paul and St. Paul
Area Chamber of Commerce, Respon-
dents.

Nos. C5–82–1584, C2–82–1607
and C3–83–7.

Supreme Court of Minnesota.

Jan. 27, 1984.

Rehearing Denied March 7, 1984.

Myer Shark, Fargo, N.D., for appellants Konrad Olson, et al.

Robert J. Schaefer, City Atty., Moorhead, for appellant City of Moorhead.

Karl Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Com'n.

Gene R. Sommers, Leonard J. Keyes, Samuel L. Hanson, Briggs & Morgan, Minneapolis, for respondent Northern States Power Co.

Peter Kissel, O'Connor & Hannan, Minneapolis, for respondent St. Paul Chamber of Commerce.

Susan W. Rester, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Public Service.

Thomas J. Stearns, St. Paul, for respondent City of St. Paul.

KELLEY, Justice.

Appellants appeal from an order of the Ramsey County District Court affirming an order of the Minnesota Public Utilities Commission (MPUC) which held that the natural gas distribution system of Northern States Power Company (NSP) serving generally the central and southeastern portions of Minnesota and the distribution system of NSP serving generally Moorhead and other communities in northwestern Minnesota were separate systems; that the cost of gas purchased by NSP to serve each system was clearly identifiable and substantially different between the systems; that rates charged to classes of customers are to reflect the cost of providing gas service; and that, accordingly, the cost of gas purchased by NSP from two separate pipeline companies must not be averaged or "rolled-in" to determine customer rates on both systems. We affirm.

NSP is a retail distributor of natural gas in Minnesota. It purchases its natural gas from wholesale pipeline companies for resale to the customers on its distribution systems. Midwestern Gas Transmission Company (Midwestern) supplies gas which NSP distributes to approximately 5,400 customers on one system serving customers in Moorhead, East Grand Forks and Dilworth (the Midwestern system). Northern Natural Gas Company (Northern) supplies gas which NSP distributes to approximately 214,000 customers on the other system in St. Paul, St. Cloud, Winona and other communities in the southeastern part of the state (the Northern system).

At the time of this proceeding, NSP purchased gas from Midwestern, a Canadian pipeline company, for $4.67 per Mcf. This gas was used entirely in serving customers on the Midwestern system. To serve its Northern system, NSP purchased gas from Northern, a domestic pipeline company, at a cost of $2.49 per Mcf.[1] NSP has, in the past, directly assigned the cost of gas purchased to customers serviced by that gas. In so doing, the cost of higher-priced Canadian gas was charged to customers on the Midwestern system; and the cost of the domestic gas was charged to customers on the Northern system. As a result, the rates paid by customers on the Midwestern system were significantly higher than the rates paid by NSP's customers on the Northern system.

The distribution facilities owned and used by NSP to service its Northern system are not physically connected to the facilities used to service its Midwestern facilities. The transmission pipelines of the two wholesale suppliers, Northern and Midwestern, however, are physically interconnected at three points in Minnesota. At these points gas can be transferred between pipelines. However, the tariff which controls the purchase of gas from Northern prohibits NSP from transferring gas provided by Northern to the Midwestern pipeline with a limited exception. The tar-

iff exception allows NSP to transfer Northern gas to the Midwestern pipeline in order to meet peak demands on its Midwestern system. Under this transfer arrangement, NSP directs Northern to transfer up to 4,000 Mcf per day of natural gas by displacement. This displacement process generally involves NSP injecting propane air volumes into its Northern system. NSP reduces the volume of gas it takes for its Northern system from Northern, and then Northern transfers that volume to the Midwestern system. Displacement transfers can only be used to the extent Northern has capability to transfer the necessary volumes to the Midwestern pipeline. These transfers are referred to as "emergency peak shaving" transfers. There is no transfer of gas from the Midwestern system to the Northern system.

Appellants contend that NSP should employ a "rolled-in" or average rate for cost of gas purchased to service all of its Minnesota customers. Under the "rolled-in" method, the purchase costs of Midwestern and Northern gas would be added together and assigned equally to all customers served by NSP in Minnesota. As a result, the rates of customers on the Northern system would be increased; conversely, the rates of customers on the Midwestern system, who historically have borne the cost of the higher-priced Canadian gas, would be decreased.

Following extensive hearings, the hearing examiner concluded that NSP's Northern and Midwestern systems were sufficiently integrated for ratemaking purposes so as to require an order directing NSP to implement "rolled-in" rates. The MPUC rejected the hearing examiner's conclusions. It held that the two distribution systems were operated as two separate systems; that the customers of each system caused NSP to incur different costs; that the cost of gas was a single cost item clearly identifiable and substantially different between the two systems; and that the cost of gas purchased from the two pipe-

1. The difference in cost is caused substantially by the Canadian government's pegging of the natural gas export price to the price of oil on the world market.

line companies must not be averaged or "rolled-in." *Northern States Power Co.,* Docket No. G–002/M–80–121 (Minn.P.U.C., August 20, 1981). On appeal, the district court affirmed the findings and conclusions of the MPUC.

We have held that upon appeal, "decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education and experience." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).[2] Administrative agencies perform both legislative and judicial functions. With respect to factual findings made by the agency in its judicial capacity, if the record contains substantial evidence supporting a factual finding, the agency's decision must be affirmed. *See, e.g., Urban Council on Mobility v. Minnesota Department of Natural Resources,* 289 N.W.2d 729, 733 (Minn.1980). Minn.Stat. § 14.69 (1982). However, when an agency acts in its legislative capacity, its decision will not be set aside unless it can be shown to be illegal by clear and convincing evidence. When the MPUC is allocating costs between utility customers and balancing various factors to achieve a fair and reasonable allocation of these costs, the MPUC operates in a legislative capacity. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). When acting in this legislative capacity, the MPUC-approved rates are presumed to be just and reasonable and will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable or discriminatory rates by clear and convincing evidence. *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 9 (Minn.1980); *see also Reserve Mining Co. v. Minnesota Public Utilities Commission,* 334 N.W.2d 389, 392 (Minn.1983).

In the present case, the MPUC first considered evidence of NSP's physical layout and determined that NSP operated two separate distribution systems which justified direct assignment of cost of the gas purchased. While the determination that NSP's gas distribution system in Minnesota was not an integrated system ultimately affects cost allocation, this determination was in the nature of a factfinding. As such, it will not be disturbed unless examination of the record shows the absence of substantial evidence to support it.

The MPUC rejected a finding of the hearing examiner that NSP's distribution system was integrated, and instead found NSP had two separate systems. Appellants argue that the agency should be bound by the hearing examiner's findings unless those findings are not supported by substantial evidence. They further contend that the MPUC failed to review the hearing examiner's findings under that substantial evidence standard and, therefore, that the MPUC order should be reversed. Our reading of the record shows, contrary to appellants' contention, that the MPUC did not ignore the factfindings of the hearing examiner. Indeed, it adopted most of his findings verbatim. The MPUC disagreed with the hearing examiner only on the inferences and conclusions to be drawn from largely undisputed facts. In arriving at its independent conclusion, the MPUC performed its proper role. Agency officials "are to render the final decision." Minn. Stat. § 14.61 (1982).

We have consistently stressed the importance of agencies employing their expertise to reach independent decisions and not to simply "rubber stamp" the findings of a hearing examiner. *See, e.g., People for Environmental Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 873 (Minn.1978). Recently, this court stated:

*School Board, Independent District No. 709,* 324 N.W.2d 361, 365 (Minn.1982).

---

**2.** Little or no deference is accorded to the decision of the reviewing district court. *See, e.g., Western Area Business and Civic Club v. Duluth*

[Hearing examiners'] functions are subordinate to a reviewing agency's * * * power. A hearing examiner presides at meetings and makes recommendations for decision. But the agency is not bound by the findings and recommendations of the hearing examiner. K. Davis, *Administrative Law Text*, § 10.07 (3rd ed. 1972). In this sense, the relationship differs from that of an appellate court reviewing a lower court's findings of fact: an agency could make new findings and decide contrary to the hearing examiner's recommendation. *Id.* at § 10.04. A hearing examiner takes no power away from an agency.

*Hymanson v. City of St. Paul*, 329 N.W.2d 324, 326–27 (Minn.1983). Moreover, a reviewing court by statute may reverse or modify an agency's decision only if it is "unsupported by substantial evidence in view of the entire record as submitted." Minn.Stat. § 14.69 (1982). A hearing examiner's report is merely one part of that record. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); K. Davis, *Administrative Law Treatise*, § 17.16 at 330 (2d ed. 1980).

Appellants contend, however, that we held in *Signal Delivery Service, Inc. v. Brynwood Transfer Co.*, 288 N.W.2d 707 (Minn.1980), that a reviewing court should reject an agency decision as unsupported by substantial evidence when the agency bases its decision upon findings contrary to those made by the hearing examiner. Appellants inaccurately read that case. We did not state that the agency was bound by the hearing examiner's report. We did find that the agency's order was unsupported by substantial evidence. *Signal*, 288 N.W.2d at 712. Appellants likewise rely on Florida cases which hold the role of the agency is to review the hearing examiner's findings and modify them only when they are not based on substantial evidence. *Pasco County School Board v. Florida Public Employees Relations Commission*, 353 So.2d 108 (Fla.App.1977); *Venetian Shores Homes & Property Owners v. Ruzakawski*, 336 So.2d 399 (Fla.App.1976). The holdings in those cases were mandated by Fla.Stat.Ann. § 120.57(1)(b)(9) (West 1982). This statute permits a Florida administrative agency to reject a hearing examiner's findings only when the agency first determines and states with particularity that those findings were not based upon competent substantial evidence. Minnesota does not have a similar statute.

Appellant Moorhead further asserts that the MPUC should be required to specifically explain the basis for its rejection of the hearing examiner's recommendation. Courts of some other jurisdictions have required agencies to explain the grounds for rejection of the hearing examiner's recommendation. *See, e.g., Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255 (4th Cir.1974); *New Jersey Department of the Public Advocate v. New Jersey Board of Public Utilities*, 189 N.J.Super. 491, 460 A.2d 1057 (App.Div.1983). There is merit to the contention that the MPUC should articulate reasons for rejecting the hearing examiner's recommendation. In future cases, better practice might prompt the agency to do so. In this case, however, it is obvious that the MPUC, accepting the largely undisputed facts, drew from them inferences and conclusions different from those drawn by the hearing examiner. Moreover, heretofore neither Minnesota statutes nor our case law has required an agency to articulate reasons for rejecting a finding of a hearing examiner. Our independent review of the record convinces us that, even absent such statement of reasons for rejecting the hearing examiner's recommendation, there existed substantial evidence to support the MPUC conclusion that NSP's natural gas distribution systems were not part of one integrated system.

Courts generally apply one of two tests in determining whether disparate rates are discriminatory or "rolled-in" rates more equitable. One test, denominated the "integrated system" test, focuses on the technical, physical layout of the utility company. *See Wisconsin Association of Manufacturers & Commerce, Inc. v. Public Service Commission*, 94 Wis.2d 314, 287 N.W.2d 844 (Ct.App.1979), appeal dismissed as

moot, 100 Wis.2d 300, 301 N.W.2d 247, (1981). Applying this test, the Wisconsin courts sustained a finding of the Wisconsin Public Service Commission that NSP's two Wisconsin systems (one serviced by Canadian gas purchased from Midwestern and the other by domestic gas purchased from Northern, as here) were two separate operating systems and not physically connected so as to justify "rolled-in" rates. *Wisconsin Association*, 94 Wis.2d at 326, 287 N.W.2d at 849.

■ In the present case the MPUC employed, in part at least, the "integrated system" test. Having found that NSP's Midwestern and Northern gas distribution systems were nonintegrated, it proceeded to allocate the cost of gas purchased so as to make customers on the Midwestern system pay for the Canadian gas purchased and the customers on the Northern system pay for the domestic gas purchased and used on that system. It held that the cost of gas purchased was the "single cost item that is clearly identifiable and substantially different between the two systems." Implicit in that conclusion is a finding that it is neither discriminatory nor inequitable to allocate the cost of purchased gas to those customers who use it, rather than making customers who obtain no or little benefit from the high cost gas pay for a portion of its cost. Appellants have failed to establish by clear and convincing evidence that this allocation between NSP's customer classes was in excess of the MPUC's authority or that it was unjust, unreasonable or discriminatory. *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5 (Minn.1980).

Another test used by some courts is the "benefits and fundamental fairness" test. This test focuses on the relationship between the utility company and its customers. *See Montana-Dakota Utilities Co. v.*

*FERC*, 631 F.2d 557 (8th Cir.1980); *LaRowe v. Kokomo Gas & Fuel Co.*, 179 Ind.App. 563, 386 N.E.2d 965 (1979);[3] *Northern States Power Co. v. Hagen*, 314 N.W.2d 278 (N.D.1982). Using this test, the Indiana Court of Appeals and the Eighth Circuit, considering the particular facts of the cases before them, held "rolled-in" rates were less discriminatory and more equitable. *Montana-Dakota Utilities*, 631 F.2d at 561; *LaRowe*, 179 Ind.App. at 582, 386 N.E.2d at 976–77. On the other hand, the North Dakota court, using the same test, reversed an order of the North Dakota Public Service Commission ordering NSP to "roll in" its purchase cost for all natural gas purchased. *Hagen*, 314 N.W.2d at 286. NSP's North Dakota distribution system was substantially the same as its Minnesota system, consisting of separate distribution systems for Canadian gas purchased and for domestic gas purchased. While the North Dakota court did implicitly reject the "integrated system" test, it did note "a finding that a system is not integrated is also a factor to be considered in determining whether or not rates should be rolled in based upon benefits and fairness." *Hagen*, 314 N.W.2d at 282 (footnote omitted).

We have never specifically adopted either the "integrated system" or the "benefits and fundamental fairness" test. We have, however, noted that the MPUC has the obligation to review and balance both cost and non-cost factors when determining revenue responsibilities for different classes of customers. *Reserve Mining Co. v. Minnesota Public Utilities Commission*, 334 N.W.2d 389, 392 (Minn.1983); *see also St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). By focusing on the benefits to and needs of NSP's customers, the "benefits and funda-

---

**3.** The Indiana court there said:

Rates * * * must reflect a relationship to service or a benefit provided in order not to be unreasonable or to discriminate unduly among classes. Rolled in rates assume that while each customer may not receive identical benefits, each receives some benefits from

being a part of the entire system. However, when it is clear that only one group benefits, that group alone should bear the cost and the rates must be "incremental" rather than rolled in to reflect that cost.

*LaRowe v. Kokomo Gas & Fuel Co.*, 179 Ind. App. 563, 579, 386 N.E.2d 965, 975 (1979).

mental fairness" test insures a more equitable rate design and allows the MPUC to balance the competing interests involved. Notwithstanding, we conclude that even had this test been applied by the MPUC, the result would have been the same. Its finding of non-integration would have been a factor weighing against "rolled-in" rates. *Hagen,* 314 N.W.2d at 282.

■ However, once non-integration is found an even clearer showing of benefits is required to "roll-in" rates than the showing when there is a finding of an integrated system. Appellants argue that the sharing of corporate and administrative costs by customers of the Midwestern and Northern systems compelled "rolled-in" rates. These costs, however, are not directly related to the availability of natural gas supplies but exist whenever a utility company operates multiple systems. *See Hagen,* 314 N.W.2d at 285. Moreover, the emergency transfer of gas from Northern to Midwestern during peak load periods was a transaction between the pipeline companies strictly governed by tariff. NSP was only involved to the extent it would use propane air on the Northern system to replace the gas transferred to the Midwestern system by Northern. On the rare occasion when this occurred, the emergency transfer only benefitted Midwestern customers; NSP's Northern customers received no benefit from these transactions. Because the MPUC was acting in its legislative capacity in making these rate allocations, it involved the balancing of costs and non-costs factors and making choices among public policy alternatives. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). Appellants have failed to demonstrate by clear and convincing evidence that the decision reached by the MPUC was unjust, unreasonable or discriminatory. The most that can be said is that the MPUC on this record could have concluded that the rates should be "rolled-in," not that it was compelled to do so or

that it was clearly wrong in failing to arrive at that conclusion.

■ Appellants next contend that as the result of the MPUC approval of "rolled-in" rates in *Inter-City Gas Co.,* No. G–007/GR–81–300 (Minn.P.U.C., May 27, 1982), and failure to do so here, there was a denial of equal protection because of disparate treatment of NSP and Inter-City customers. Inconsistencies in decisions by comparison with other cases are not proof of arbitrariness nor do they constitute a violation of equal protection of the laws. Each company's operations and the facts in the record before the commission should serve as the basis for establishing that company's rate structure. *See, e.g., Wisconsin Association of Manufacturers and Commerce, Inc. v. Public Service Commission,* 94 Wis.2d 314, 327 n. 2, 287 N.W.2d 844, 849 n. 22 (1979).

■ Finally, appellant FM Apartment Association argues that the MPUC proceeded unlawfully because one of the commissioners involved in the decisionmaking took office several months after the hearings closed, and further because other deciding commissioners failed to read the record before the hearing examiner. An administrative decision is not invalid due to a change in personnel or because one of the officers participating in the decision was not present when the evidence was taken, providing that he has considered and acted upon the evidence received in his absence. 2 Am.Jur.2d *Administrative Law* § 437 at 246 (1962); *see also King's Mill Homeowners Association v. City of Westminster,* 192 Colo. 305, 557 P.2d 1186 (1976); *State Board of Funeral Directors v. Cieslak,* 24 Pa.Cmwlth.Ct. 315, 355 A.2d 590 (1976). All agency decisions come to this court with the presumption of regularity. The burden of proof is on appellant to establish that the commission's decision was improperly reached. *No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 325 (Minn.1977).[4] None of

---

**4.** Appellant FM Apartment Association could have attempted to substantiate its bare allega-

tion by limited discovery, *People for Environmental Enlightenment and Responsibility*

the appellants, and particularly appellant FM Apartment Association, have presented any evidence that any of the commissioners failed to review the evidence before participating in the decision. They have, therefore, failed to meet their burden of proof, and the MPUC procedure in rendering its decision was proper.

Accordingly, we affirm the trial court's order sustaining the order of MPUC that cost of purchased gas should not be "rolled-in" for the purpose of establishing rates consumers of gas on NSP's Midwestern and Northern systems should pay.

Affirmed.

*(PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 872–73 (Minn.1978), but failed to do so.