**In the Matter of the STATE of Minnesota, by Linda C. JOHNSON, Commissioner, Department of Human Rights, Relator,**

v.

**CITY OF DULUTH, Respondent.**

**No. C5–86–1660.**

Court of Appeals of Minnesota.

March 17, 1987.

Review Denied May 18, 1987.

Hubert H. Humphrey, III, State Atty. Gen., Richard L. Varco, Jr., Special Asst. Atty. Gen., St. Paul, for relator.

William P. Dinan, Duluth City Atty., Mary E. Asmus, Asst. City Atty., Duluth, for respondent.

Heard, considered and decided by SEDGWICK, P.J., and LANSING and CRIPPEN, JJ.

## OPINION

SEDGWICK, Judge.

In this appeal from a final administrative decision in a contested case, the State contends the administrative law judge erred in dismissing its complaint of employment discrimination based on disability under the Minnesota Human Rights Act. We affirm.

## FACTS

In 1979, the City of Duluth established a program of special testing, known as the "100–day program," for disabled persons interested in obtaining employment with the city. The program was designed to enable disabled persons whose disabilities prevent them from competing equally in the standard written civil service examinations to prove their job qualifications by working on the job for which they are applying for up to 100 days.

The following civil service rule provides the procedure and criteria for admission into the program:

> Any person with a disability who believes that such disability is such that any original entrance test * * * does not provide such person an equal opportunity to demonstrate or manifest such person's suitability for employment in a particular classification * * * may request * * * to be tested for such classification by being temporarily employed in such classification.

>    \*     \*     \*     \*     \*     \*

> The [Disability Advisory Commission ("DAC")] shall * * * determine whether it agrees with the requestor's above-mentioned belief. If it thus agrees, it may recommend to the [Civil Service Board ("CSB")] that the [CSB] permit the requestor to be tested for the particular classification by being temporarily employed in a position in such classification. The [DAC] shall then also provide to the [CSB] information which supports the [DAC's] recommendation. The [CSB] may authorize such special test, with or without such recommendation by the [DAC], if the [CSB] agrees with the requestor's belief.

On March 6, 1980, Richard Occhino asked to participate in the 100–day program for a position as a water and gas maintenance apprentice. On September 9, 1980, the DAC recommended by a four to one vote that the CSB admit Occhino into the program based on his "history of epilepsy and emotional problems which has impaired his ability to compete effectively in the traditional civil service selection process." However, Occhino withdrew his application before the CSB could act on it.

Occhino renewed his application in July, 1981. On August 11, 1981, the DAC voted four to one to allow its original recommendation to stand.

The CSB considered the DAC's recommendation on August 18, 1981. The minutes of the meeting as initially prepared state:

Following discussion, the [CSB] moved to: 1) reject the recommendation of the [DAC], and 2) return the recommendation to the [DAC] for additional information.

When the CSB approved those minutes on September 1, 1981, however, it corrected item two to read as follows:

2) the [DAC] reconsider this application only if they deem it necessary—the [CSB] is not requesting additional information regarding this matter.

On December 8, 1981, Occhino filed a charge of employment discrimination against Duluth with the Minnesota Department of Human Rights. After initially finding that no probable cause exists to credit the allegation, the Department reversed itself and found probable cause. On September 18, 1985, the Commissioner of Human Rights issued a complaint alleging that Duluth had violated the Minnesota Human Rights Act's prohibition against unfair employment discrimination based on disability.

After a contested case hearing, the administrative law judge dismissed the complaint. He concluded that the State had failed to establish a prima facie case of employment discrimination; that Duluth had articulated legitimate, non-discriminatory reasons for its action; and that the State had not demonstrated that those reasons were pretextual. He denied the State's motion for reconsideration, and this appeal followed.

## ISSUE

Did the administrative law judge err in determining that appellant failed to establish a prima facie case of employment discrimination based on disability under the Minnesota Human Rights Act?

## ANALYSIS

Minn.Stat. § 14.69 (1986) provides that on appeal a court may reverse the decision of an agency in a contested case

if the substantial rights of the petitioners may have been prejudiced because the

administrative · finding, inferences, conclusion, or decisions are:

\* \* \* \* \* \*

(d) Affected by \* \* \* error of law; or
(e) Unsupported by substantial evidence in view of the entire record as submitted \* \* \*.

The State argues that we should reverse the administrative law judge's order of dismissal because his conclusion that it failed to establish a prima facie case is affected by error of law, and his conclusion that Duluth had articulated non-discriminatory reasons for its failure to accept Occhino into the program is not supported by substantial evidence.

▇▇▇ The administrative law judge's decision in favor of Duluth is a final decision of the Minnesota Department of Human Rights. Minn.Stat. § 363.071, subd. 3 (1986). On appeal, decisions made by administrative agencies are presumed correct. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). Factual findings made by an agency in a quasi-judicial context, such as this, will be upheld if they are supported by "substantial evidence." *City of Moorhead v. Minnesota Public Utilities Commission*, 343 N.W.2d 843, 846 (Minn. 1984). This means the evidence "considered in its entirety" is such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Reserve Mining*, 256 N.W.2d at 825.

The Commissioner's complaint alleges that Duluth violated Minn.Stat. § 363.03, subd. 1(2) (1984). That statute provides:

Except when based on a bona fide occupational qualification, it is an unfair employment practice:

\* \* \* \* \* \*

(2) For an employer, because of \* \* \* disability \* \* \*,

\* \* \* \* \* \*

(c) to discriminate against a person with respect to hiring \* \* \*.

*Id.*

The Minnesota Supreme Court has adopted the three-part test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for analyzing claims of unfair employment discrimination under the Minnesota Human Rights Act. *See, e.g., Sigurdson v. Isanti County,* 386 N.W.2d 715 (Minn.1986). This analysis consists of (1) plaintiff establishing a prima facie case of discrimination; (2) defendant answering with evidence of some legitimate, non-discriminatory reason for its action; and (3) plaintiff rebutting the answer by showing the reason is actually a pretext for discrimination. *Id.* at 720.

The elements of a prima facie case vary depending on the specific facts of the case. *Sigurdson,* 386 N.W.2d at 720. We believe to establish a prima facie case here, the State would have to show, at a minimum, that Occhino (1) is disabled; (2) sought a position in and was qualified for the 100–day program; and (3) was denied admittance. *See Sigurdson,* 386 N.W.2d at 720; *see also Fisher Nut Co. v. Lewis ex rel. Garcia,* 320 N.W.2d 731 (Minn.1982).

▇▇▇ Although the DAC's recommendation to the CSB that Occhino be accepted into the 100–day program stated that he is disabled because of emotional problems and epilepsy, the disability underlying Occhino's application to the program and his charge of employment discrimination is his emotional problems. The following findings of fact depict the nature of Occhino's emotional disability:

28(a). Behavioral problems led to a "large number of placements in various kinds of institutions" since the age of six "culminating" in commitment to the State Security Hospital [St. Peter] at age 19 in 1965 as "mentally ill and dangerous."

\* \* \* \* \* \*

(g). After his release from St. Peter, [Occhino] continued to be periodically institutionalized for what has been described as antisocial behavior \* \* \*.

\* \* \* \* \* \*

29. [Occhino] is egocentric, emotionally unstable, easily frustrated and tempermental. He gets particularly angry at

others when he feels he is being dealt with unfairly which happens frequently because of his limited insight into why things are not going his way.

30. [Occhino] has difficulty with "authority-type situations" * * *.

31. [Occhino] has more paranoia * * than most people. * * *

32. [Occhino] was described by his doctor 13 years ago * * * as being "morbidly and obsessively preoccupied" with being discriminated against.

33. [Occhino's] antagonism and suspicion extends particularly to governmental officials and institutions. * * *

34. * * * [A] medical doctor * * * in 1968 * * * found [Occhino] to be a "classical, impulsive acting-out individual, who has a pathological lack of impulse control."

The administrative law judge found that Occhino was disabled within the meaning of the statute. *See* Minn.Stat. § 363.01, subd. 25 (1984) (defining "disability"). He also concluded that the State had not proven by a preponderance of the evidence that Occhino qualified for the 100–day program. We agree.

As the administrative law judge noted,

Part of the decision as to whether an applicant should be allowed to circumvent the normal competitive testing process, requires an assessment of the test involved and the degree to which the applicant's disability makes the test discriminatory. [Occhino] possesses ordinary intelligence and more than ordinary verbal skills. The test for the position * is a very simple multiple choice quiz which requires identification of pictures of a hammer, a wrench, a trowel, road signs, etc.; plus a "performance test" of lifting and carrying a jackhammer, shoveling and handling pipe.

The record before the CSB when it rejected the DAC's recommendation included a report of a psychological evaluation of Occhino, dated June 7, 1980, prepared by Dr. Robert Hoffman at the request of the Minnesota Department of Rehabilitation. Hoffman's report states that on the Wechsler Adult Intelligence Scale test, Occhino received "bright-normal" verbal I.Q. scores, and "average" performance and full-scale I.Q. scores. It also states:

[Occhino] does make an impression of being a verbally intelligent individual but also being a rather emotionally primitive individual who lacks good judgment, and possesses a super abundance of aggressiveness and antisocial tendencies.

* * * * * *

* * * Despite his manicy [sic] performance in general during testing, he showed excellent ability to attend and concentrate on a task in those subtests usually subject to vagaries in attention *.

* * * [H]e seems to have relatively more problems with common sense judgment about daily situations than with other aspects of intelligence.

* * * He comes on as a rather egocentric and obnoxious individual * * *. Perhaps the best diagnostic label * * * is personality disorder including elements of sociopathy and explosiveness. * * *

Employing this man is going to be a problem given his hostility toward authority and lack of insight vis-a-vis the world. I would suspect he would be non-cooperative with teachers and later supervisors on the job. * * * I question the ability of his testing via the 100–day program since his hostility and impulsivity will undoubtedly terminate this effort quickly.

Dr. Gary Cowan, Occhino's psychiatrist, testified that while Occhino is of average intelligence and would be intellectually and physically capable of working in the Water and Gas Department, he was "not sure whether [Occhino] would be able to emotionally tolerate the job in view of his long-standing history of difficulty within * * * personal relationships." Dr. Cowan also testified that Occhino was "paranoid," that the essence of his "personality disorder" was that he was "hyper-sensitive," that he overreacted to feelings of frustration, anger and rejection, and that as a result of

his mental condition he is less able than the average person to get along with others.

Also before the CSB was a report from Robert Lundahl, Occhino's counselor from the Division of Vocational Rehabilitation of the Minnesota Department of Economic Security. Lundahl's report states:

I am referring [Occhino] for consideration under [the 100–day] program and am submitting a copy of [Dr. Hoffman's] evaluation as evidence of the disability and functional limitations.

[Occhino] presents a mixed picture. On one hand he is scrupulously honest and has worked successfully for * * * 100 days on a temporary appointment with the county. On the other hand, he can be a very abrasive person and thus ruin his opportunities before they bear fruit. However, I have never known him to physically abuse anyone who wasn't using physical force on him, or threatening to.

My rationale for attempting to obtain an alternate testing process for [Occhino] is spelled out in his approach to the psychological evaluation [by Dr. Hoffman]. His egocentricity, over-verbalizing, preoccupied and manicy approach to a testing situation will inevitably result in his making a poor showing on any testing procedure other than a job try-out. In addition, his poor social judgment makes it difficult for him to tolerate a situation which he sees as not related to the goal he is trying to reach.

I cannot honestly present [Occhino] as an excellent candidate for a successful placement. The very behavior which prompts this referral can also carry over into the work situation with disastrous results. However, [Occhino] * * * verbalizes an ability to keep his personal feelings out of the work-site; and if given an opportunity in a meaningful job at a reasonable wage may end up surprising all of us.

The State argues that the evidence shows that Occhino qualified for the 100–day program. It relies almost entirely on Lundahl's report, specifically the reference to Dr. Hoffman's description of Occhino's "manicy" approach to testing and his poor social judgment.

The record is clear that Occhino did not qualify for the 100–day program. The nature of his disability indicates that he could compete more effectively by taking the standard written and performance test than through an on-the-job try-out.

The administrative law judge's conclusion that the State has not proven that Occhino qualified for the 100–day program is supported by substantial evidence. His conclusion that the State failed to establish a prima facie case is therefore correct. We need not address his other conclusions.

## DECISION

The State failed to establish a prima facie case of employment discrimination because it did not prove that Occhino qualified for the program for which he applied.

Affirmed.